John T. DUNLOP, Secretary of Labor, United States Department of Labor

v.

The STATE OF RHODE ISLAND and Providence Plantations.

Civ. A. No. 74–24.

United States District Court, D. Rhode Island.

Aug. 4, 1975.

William J. Kilberg, Albert H. Ross, and Frank V. McDermott, Jr., U. S. Dept. of Labor, Boston, Mass., for plaintiff.

Julius C. Michaelson, Atty. Gen., R. I., Ronald Dwight, Special Asst. Atty. Gen., R. I., Providence, R. I., for defendant.

OPINION

PETTINE, Chief Judge.

This matter is before the Court to determine plaintiff's motion for summary judgment. Plaintiff, the Secretary of Labor, United States Department of Labor, has filed suit in his official capacity under 29 U.S.C. § 217 against the State of Rhode Island for injunctive relief to restrain the State as employer at the state-owned O'Rourke Children's Center from committing further violations of the overtime provisions of the

Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq., and to enjoin the State from further withholding overtime compensation found to be due to certain O'Rourke employees under the Act. The Secretary asserts that summary judgment is appropriate since the identical factual aspects presented in the instant case were already determined against the defendant in *Pontarelli v. Spinelli,* C.A. No. 4539, unreported opinion (D.R.I. 7/6/72) (Appendix A), *judgment vacated on other grounds,* No. 72–1304, 72–1305, unreported mem. and order (1st Cir. 5/16/73), and thus, by virtue of the doctrine of collateral estoppel, no factual dispute remains.

### The Proceedings in Pontarelli

In *Pontarelli v. Spinelli, supra,* certain employees of the O'Rourke Children's Center sued the State of Rhode Island and various state officials under § 16 (b) of the FLSA, 29 U.S.C. § 216(b), to recover unpaid overtime compensation assertedly withheld by their employer, the State, in violation of the 1966 amendments to the Act, 29 U.S.C. §§ 203, 207 (a)(2). In the *Pontarelli* opinion, this Court made findings of fact and conclusions of law to the effect that the plaintiffs therein as well as others employed at the Center as "House Parents" and "Senior House Parents" were "employed at a state-owned institution of the type contemplated by the 1966 amendments to the FLSA" (*infra* at 1277) and that the "standby hours" spent by the two classes of houseparents in excess of their eight hours of active duty were also a part of their job requirements and therefore compensable as overtime within the strictures of the FLSA. The Court enjoined continuation of the employment arrangement which violated the FLSA and, after suggesting a formula to determine past amounts withheld, deferred an accounting of amounts due until conclusion of any appellate review.

The defendants appealed to the First Circuit. On April 18, 1973, the United States Supreme Court ruled in *Employees of the Department of Public Health and Welfare of Missouri v. Department of Public Health and Welfare of Missouri,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251, that an action brought by state employees to compel their employer, the state, to comply with the 1966 Amendments to the FLSA was barred by the Eleventh Amendment to the United States Constitution. Concluding that this ruling was directly on point and barred the plaintiffs' action in *Pontarelli,* the First Circuit vacated this Court's ruling below on Eleventh Amendment grounds and remanded the case with directions that the complaint be dismissed.

The Secretary of Labor instituted the instant action on February 11, 1974, seeking precisely the same relief as that sought in *Pontarelli,* albeit for a subsequent period of time due to the operation of the applicable statute of limitations, 29 U.S.C. § 255, which restricts recovery to the two-year period preceding commencement of a suit with an additional third year of recovery if a wilful violation is shown. It appears that prospective injunctive relief is no longer required since the State terminated the challenged work arrangement as of January 13, 1973. Plaintiff still seeks to restrain the State from continuing to withhold overtime payments outstanding for the appropriate period, as determined by 29 U.S.C. § 255. The parties have stipulated that:

> "[A]ll the facts which were presented to the court in the case of *Pontarelli, et al. v. Spinelli, et al.,* Civil Action No. 4539, decided July 6, 1972, are the facts which would be presented to this court in the instant case in the event this latter case went to trial." Stipulation (April 14, 1975).

### Eleventh Amendment

The need for prospective relief having been obviated, by his remaining claim in essence the Secretary seeks to recover the overtime payments due individual employees. If successful, it can be anticipated that such monies will eventual-

ly be disbursed to the individual employees, among whom were the original plaintiffs barred in *Pontarelli.* The Court therefore asked the parties to brief the question implicated by these circumstances:

"In view of the fact that any monetary award would come from the general treasury of the State and would be for the benefit of, and would ultimately pass to, the individual employees involved, do the Supreme Court decisions in *Employees of the Dept. of Public Health & Welfare v. Dept. of Public Health & Welfare,* 411 U.S. 279 [93 S.Ct. 1641, 36 L.Ed. 2d 251] (1973) and *Edelman v. Jordan,* 415 U.S. 651 [94 S.Ct. 1347, 39 L.Ed.2d 662] (1974) require an interpretation of the Eleventh Amendment which would bar an award of damages in this action?" Letter to parties, dated December 23, 1974.

Despite the State's colorful characterization of the within action as a "subterfuge", the Secretary's role herein is not as such an agent of the underpaid employees who may circumvent the Eleventh Amendment. It is clear that the Eleventh Amendment bar of certain suits against the states brought in federal courts does not apply to the United States. *United States v. Mississippi,* 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). As the State acknowledges, this action is a suit brought by the United States, *see Brennan v. Iowa,* 494 F.2d 100 (8th Cir. 1974), *cert. denied sub nom., Iowa v. Dunlop,* —— U.S. ——, 95 S.Ct. 2422, 44 L.Ed.2d 683 (1975). In addition, a review of the distinctions between the remedies provided in §§ 16(b) and 17 of the Act, 29 U.S.C. §§ 216(b), 217, reveals that the instant action is brought primarily on behalf of the United States "to redress a wrong being done to the public good", *Wirtz v. Jones,* 340 F.2d 901, 905 (5th Cir. 1965), whose success will produce the necessary but secondary result of reimbursing the underpaid employees in question. As

recognized in *Wirtz v. Jones, supra,* in which the Fifth Circuit explored the genesis of § 17 of the FLSA, 29 U.S.C. § 217:

"The history and purpose of the Fair Labor Standards Act and of § 17, both in its wording and in its relationship to the other sections of the Act, make it abundantly clear that § 17 was designed and enacted as a necessary measure to assure the effective and uniform compliance with and adherence to a public policy, relating to wage standards for labor, adopted in the National interest.

\* \* \* \* \* \*

[Unlike a § 16(b) action, in a § 17 action,] however, the purpose of the injunction to restrain the withholding of wages due is not to collect a debt owed by an employer to his employee but to correct a continuing offense against the public interest. It is true that as a result, money may pass from the employer into the pocket of the employee or, if he is not available, then into the coffers of the United States, but that enforced payment which must be made even if the employee or his representatives or heirs no longer exist to claim it, is simply a part of a reasonable and effective means . . . to bring about a general compliance with § 15(a)(2) . . . '[to] serve as a source of protection to employers who pay a decent wage and who must compete with employers who pay a substandard wage.' "

340 F.2d at 903–905 (footnote, citation omitted).

In *Employees* itself, the Supreme Court recognized a major distinction between the employee cause of action provided by § 16(b) and federal enforcement by the Secretary under § 17. The distinction between the two causes of action was not raised as mere dictum in *Employees.* To the contrary, it constituted an integral part of the Court's conclusion that it could not infer, as it had done in *Parden v. Terminal R.*

*Co.,* 377 U.S. 184, 192, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), with respect to the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.,* a waiver of Eleventh Amendment and sovereign immunity by a state's engaging in an enterprise covered by the FLSA. In *Parden,* the Court concluded that:

▮ "To read a 'sovereign immunity exception' into the Act would result, moreover, in a right without a remedy; it would mean that Congress made 'every' interstate railroad liable in damages to injured employees but left one class of such employees— those whose employers happen to be state owned—without any effective means of enforcing that liability. We are unwilling to conclude that Congress intended so pointless and frustrating a result. We therefore read the FELA as authorizing suit in a Federal District Court against state-owned as well as privately owned common carriers by railroad in interstate commerce." *Id.* at 190, 84 S.Ct. at 1211 (footnote omitted).

In contrast, the Court in *Employees* relied precisely upon the Congressional provision for enforcement by the Secretary of Labor in concluding that the *Parden* analysis did not apply to the issue of state immunity under the FLSA:

"By holding that Congress did not lift the sovereign immunity of the States under the FLSA, we do not make the extension of coverage to state employees meaningless. Cf. *Parden v. Terminal R. Co., supra,* at 190 [84 S.Ct. 1207]. Section 16(c) gives the Secretary of Labor authority to bring suit for unpaid minimum wages or unpaid overtime compensation under the FLSA. Once the Secretary · acts under § 16(c), the right of any employee or employees to sue under § 16(b) terminates. Section 17 gives the Secretary power to seek to enjoin violations of the Act and to obtain restitution in behalf of employees. Sections 16 and 17 suggest that since private enforcement of the Act was not a paramount objective, disallowance of suits by state employees and remitting them to relief through the Secretary of Labor may explain why Congress was silent as to waiver of sovereign immunity of the States. For suits by the United States against a State are not barred by the Constitution. See *United States v. Mississippi,* 380 U.S. 128, 140–141 [85 S.Ct. 808, 13 L.Ed.2d 717]. In this connection, it is not amiss to note that § 16(b) allows recovery by employees, not only of the amount of unpaid wages, but of an equal amount as liquidated damages and attorneys' fees. It is one thing, as in *Parden,* to make a state employee whole; it is quite another to let him recover double against a State. Recalcitrant private employers may be whipped into line in that manner. But we are reluctant to believe that Congress in pursuit of a harmonious federalism desired to treat the States so harshly. The policy of the Act so far as the States are concerned is wholly served by allowing the delicate federal-state relationship to be managed through the Secretary of Labor." *Id.* 411 U.S. at 285–286, 93 S.Ct. at 1618.

Based upon the foregoing analysis, the Court concludes that neither the Eleventh Amendment nor sovereign immunity constitutes a bar to maintenance of the instant action for recovery of overtime compensation by the Secretary of Labor. *See, e. g., Brennan v. Indiana,* 517 F.2d 1179 (7th Cir. 1975); *Hodgson v. Board of Education, Parsippany-Troy Hills,* 344 F.Supp. 79 (D.N.J. 1972), *appeal dismissed,* 468 F.2d 1325 (3d Cir. 1972); *Hodgson v. State of Missouri,* 340 F.Supp. 1188 (W.D.Mo. 1972).

*Determination of Liability*

The Secretary contends that the doctrine of collateral estoppel is applicable to the case at bar so as to require that

all the factual issues in dispute be resolved in accordance with this Court's ruling in *Pontarelli, supra*.

 This argument is without merit. It is elementary that the doctrine of collateral estoppel only applies to bar relitigation of questions of fact which have been actually and "finally determined by a court of competent jurisdiction". 1B Moore, Federal Practice Par. 0.441[2] at 3777 (1974).

"A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel." *Id.* Par. 0.416[2] at 2231.

Here although the factual issues were *actually* litigated and *judicially* determined, they were not upheld upon final judgment. To the contrary, the First Circuit vacated the decision and order of this Court on the ground that the federal court had been denied jurisdiction to hear the matter by virtue of the Eleventh Amendment to the Constitution.

At the same time, however, the Court sees no useful purpose in re-examining the evidence and redetermining its findings. The parties have stipulated that no new evidence will be presented to distinguish the Court's inquiry herein from that undertaken in *Pontarelli;* and the State has proffered no factual or legal arguments which would counsel the Court to reconsider its previous determination. The Court therefore adopts and incorporates by reference all of the findings of fact and conclusions of law that it made in *Pontarelli, infra* at 1276–1277, 1279–1284, to the effect that the State has not complied with the overtime requirements of the FLSA in compensating its House Parents and Senior Houseparents ·at the O'Rourke Center from March 1969 until January 13, 1973. (Affidavit of Joseph R. Pellegrino, p. 2). *See* Appendix A. *Cf.*

1B Moore, Federal Practice Par. 0.416 [2] at 2231.

## Statute of Limitations

Section 255 of 29 U.S.C. governs the determination of the appropriate period for recovery of overtime compensation withheld in violation of the FLSA. Under 29 U.S.C. § 255, restitution is limited to the two-year period preceding commencement of the action unless the employer's violation of the FLSA is found to have been wilful. In such case, a three-year recovery period is prescribed. *See* Appendix A, *infra*, at 1284.

In *Pontarelli*, this Court concluded that the State's violation was not wilful. The original complaint in *Pontarelli* was filed on March 1, 1971. Appendix A, *infra* at 1285. The three-year period there involved extended back to March 2, 1968. The Secretary commenced this action on February 11, 1974. Thus the three-year period at issue here commenced on February 12, 1971. These periods of employment at the Center in violation of the FLSA are obviously not contiguous. The Secretary urges this fact and the construction given the "wilfulness" exception in recent decisional law in support of his contention that the Court consider the question afresh and determine that the State's violation was "wilful" during the period here in question. The Secretary urges the Court to adopt the analysis of the Fifth Circuit, which was first expressed in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1141–1142 (5th Cir. 1972), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219:

"Even though Trainor [the employer] consulted his lawyers, and evidently relied on legal advice, we agree with the district court that Trainor's decision to change Jiffy June's rate of pay was 'wilful' within the meaning of that term as used in the 1966 amendment of § 255. Trainor decided to consent to the change in

rates of pay for overtime work despite his awareness that the FLSA might prevent such a change. He had previously paid his employees the federal overtime rate; and Trainor's decision to request an opinion of counsel is further evidence that he did not stop paying the statutory overtime without any inkling that the federal wage scheme might thereby be violated. We cannot excuse Trainor from these suspicions simply because his lawyer told him that he need not fear federal overruling of his new agreement with Teamsters'. The advice of counsel to proceed with a favorable wage settlement which undercuts the FLSA would be an easy way of circumventing the requirements of the Act—far too easy a way for us to assume that Congress intended to subject employees to the strict two-year limitations period whenever an employer's lawyer had given him the green light to restructure their pay.

The entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress. Requiring employers to have more than *awareness of the possible applicability of the FLSA* would be inconsistent with that intent. Consequently, we hold that employer's decision to change his employees' rate of pay in violation of FLSA is 'wilful' when, as in this case, there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA. Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture? In this case, Trainor knew that the FLSA had to be considered when he ceased to comply with the Act and asked his lawyer if it was permissible to do so. We need not consider today whether the three-year statute of limitations applies in a case where the employer

ought to have known of the possible applicability of the FLSA but can demonstrate compellingly that in fact he did not." (Emphasis added).

As the above-quoted language indicates, the employment compensation plan found violative of the FLSA in *Jiffy June* represented a *change* in the employer's practices. Previously, the employer had paid his employees the federal overtime rate. In contrast, here the State was *continuing* a practice made violative of the FLSA by virtue of 1966 amendments to that act. Since this Court decided *Pontarelli*, the Fifth Circuit subsequently rejected that distinction as immaterial in *Brennan v. Heard*, 491 F.2d 1, 3 (1974), stating:

"[T]he decisions of this Court in *Coleman v. Jiffy June Farms, Inc.*, 5 Cir. 1972, 458 F.2d 1139, and *Brennan v. J. M. Fields, Inc.*, 5 Cir. 1973, 488 F.2d 443 . . . establish that neither a good faith belief in the lawfulness of his wage and overtime regulations nor complete ignorance of their invalidity shields the employer from the additional year of liability. Such nescience and naivete are not determinative on the question of willfulness under this Act. An employer acts willfully and subjects himself to the three year liability provision if he knows, or has reason to know, that his conduct is *governed by* the Fair Labor Standards Act.

\* \* \* \* \* \*

The record amply supports, indeed it compels, a finding of willfulness in this case. The individual defendant Heard, president of defendant Fuel Company, testified that he knew of the existence of the Fair Labor Standards Act and had 'heard talk' that recent amendments had extended coverage to those in the position of his employees. Defendant's unwillingness to make further inquiries and to determine the exact parameters of his statutory obligation affords him

no protection. An ostrichlike cultivation of ignorance has never been considered a defense to liability for willful violation of the Act. *See Mitchell v. Hausman*, 5 Cir. 1958, 261 F.2d 778, 780." (Emphasis in original).

These two decisions have recently been cited with approval by the First Circuit in *F. X. Messina Construction Corp. v. Occupational Safety and Health Review Commission*, 505 F.2d 701, 702 (1st Cir. 1974).

■ Lower court decisions applying the analysis of the cited Fifth Circuit decisions have held that *prior investigation* by the Secretary into possible violations of the FLSA is sufficient to put an employer "on notice" that his conduct is governed by the FLSA and to mandate a finding of wilful violation if the practice is thereafter continued. *See, e. g., Hodgson v. Cactus Craft of Arizona*, 481 F.2d 464 (9th Cir. 1973); *Hodgson v. Eunice Superette, Inc.*, 368 F.Supp. 639 (W.D.La.1973); *Brennan v. S & M Enterprises*, 362 F.Supp. 595 (D.D.C.1973). Here the State was put on notice that its employment practices at the Children's Center were alleged to be governed by the FLSA by the commencement of *Pontarelli* on March 1, 1971. Such formal notice is certainly more substantial evidence of the employer's "awareness of the possible applicability of FLSA", *Jiffy June, supra* at 1142, than the employer's merely "hearing talk" of extension of FLSA coverage to it, which was found to be a sufficient basis for a finding of "wilfulness" in *Brennan v. Heard, supra* at 3. Certainly by March 1, 1971, the State knew that "the FLSA was in the picture". *Jiffy June, supra* at 1142.

According to the analysis of these cases, the State's good faith belief in the merits of its position, even upon advice of counsel, does not negate a finding of "wilfulness" within the meaning of 29 U.S.C. § 255. The Court therefore concludes that the State's violation of the FLSA herein was "wilful" and that the three-year limitation period applies.[1]

### Damages

In *Pontarelli* this Court in general deferred the computation of damages pending appellate review. The Court did address itself, *infra* at 1286, to a method for computing the "regular rate" of compensation of the houseparents, from which the "time and a half" overtime rate could be computed. According to the affidavit of June 4, 1975, of Joseph R. Pellegrino, an employee of the Department of Labor, the Department has endeavored to make the necessary computations in conformance with the *Pontarelli* formula for the period of liability found herein. It is not clear from the state of the record whether the State disputes the method employed by the Department or the accuracy of its computations. In the event that such a dispute exists, the Court can only echo its earlier conclusion that the determination of the amount of overtime compensation owed "must necessarily entail a time-consuming and complicated accounting process, which might best proceed under the supervision of a special master". Appendix A, *infra* at 1286. Therefore, the parties shall inform the Court within one week of the entry of this opinion whether a dispute exists as to the computation of the exact amount of damages to be awarded. If such dispute remains, a special master will be appointed pursuant to Fed.R.Civ.P. 53.

1. As the Secretary correctly points out in his memorandum in support of the motion for summary judgment at page 6, a review of the transcript of the *Pontarelli* trial reveals that the State was well aware of the FLSA applicability to the Center as early as the summer of 1968 when negotiations concerning the Center employees' right to overtime compensation had been commenced. (Transcript at 20–26, 44–45, 55, 106, 119).

Lastly, although of no direct legal consequence, one should not lose sight of the fact that but for the operation of the Eleventh Amendment, the period of recovery would have begun in 1969.

## APPENDIX A

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

JOSEPH PONTARELLI, et al.

v.

FRANK A. SPINELLI, Superintendent
of Doctor Patrick I. O'Rourke
Children's Center, RAYMOND HAWKSLEY,
General Treasurer, of the State of
Rhode Island, ANTHONY P. TRAVISONO,
Director of the Department of Social
Welfare and the STATE OF RHODE ISLAND,
a Sovereign

⎫
⎬ Civil Action No. 4539
⎭

---

OPINION

July 6, 1972

PETTINE, Chief Judge.

The plaintiffs bring this action pursuant to the civil remedy provisions of the Fair Labor Standards Act to recover unpaid overtime compensation. 29 U.S. C. § 216(b). Plaintiffs allege that they are within the coverage of the FLSA by virtue of the 1966 amendments to the Act.

The "maximum hours" section of the FLSA, 29 U.S.C. § 207, provides in part as follows:

"(2) No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments to this Act by the Fair Labor Standards Amendments of 1966—

(A) for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966,

(B) for a workweek longer than forty-two hours during the second year from such date, or

(C) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Under the 1966 Amendments to the FLSA, the expanded definition of "enterprise engaged in commerce or in the production of goods for commerce" includes:

"an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—
. . . is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, an elementary or secondary school, or an institution of higher education

(regardless of whether or not such hospital, institution, or school is public or private or operated for a profit or not for profit)."

29 U.S.C. § 203(s)(4).

The 1966 amendments also altered the definition of "employer" so as to remove the exemption of the States and their political subdivisions with respect to certain employees:

"'Employer' includes any person acting directly or indirectly in the interest of employer to an employee but shall not include the United States or any State or political subdivision of a State (except with respect to employees of a state, or a political subdivision thereof, employed (1) in a hospital, institution, or school referred to in the last sentence of subsection (r) of this section, or (2) in the operation of a railway or carrier referred to in such sentence), or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

29 U.S.C. § 203(d) (1966 addition underlined).

The "hospital(s), institution(s), or school(s) referred to in the last sentence of subsection (r)" of § 203 are described in the same terms as the hospitals, institutions and schools included in the definition of "enterprise engaged in commerce or in the production of goods for commerce," *supra.*[1]

The stipulation of facts filed by the parties in the instant case establishes the following:

" . . . That the Plaintiffs are employed as houseparents or Senior houseparents of the Patrick I. O'Rourke Children's Institution;

. . . That said institution is (wholly) owned and operated by the State of Rhode Island and has been in operation for at least twenty (20) years;

. . . That the children at said institution are orphans, indigent, homeless, sick, healthy, delinquents, wayward, mentally deficient and mentally gifted.

. . . '. The State purchases for use at the Children's Institution: food, drugs, clothing, fuel, furniture, bed, clothing, and sundry items that are produced, manufactured and transported from out of state."

From the above facts it is abundantly clear that the plaintiffs are employed at a state-owned institution of the type contemplated by the 1966 amendments to the FLSA, and that said institution has employees "handling, selling or otherwise working on goods that have moved in . . . (interstate) commerce." I find that the plaintiffs are "employed in an enterprise engaged in commerce or in the production of goods for commerce," and are "brought within the purview of (29 U.S.C. § 207(a) (2)) by . . . the Fair Labor Standards Amendments of 1966." As such the plaintiffs are entitled to bring an action under 29 U.S.C. § 216(b).[2]

---

[1]. 29 U.S.C. § 203(r) (definition of "enterprise"): " . . . For purposes of this subsection, the activities performed by any persons or persons—
(1) in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, an elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or op-

erated for profit or not for profit), . . . shall be deemed to be activities performed for a business purpose."

[2]. 29 U.S.C. § 216(b): "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any

*Sovereign Immunity*

Among the defenses pleaded in defendants' answer is that the State's constitutionally guaranteed sovereign immunity bars the instant suit. Although the defendants may have intended to withdraw and waive this defense when they later stipulated that "this Honorable Court has jurisdiction to hear (the case)", I deem it appropriate at this time to review the relevant case law and to state this court's position on the issue of sovereign immunity.

In *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1963), the State of Maryland and 27 other states brought suit against the Secretary of Labor to enjoin enforcement of the Fair Labor Standards Act as it applied, subsequent to the 1966 amendments, to schools and hospitals operated by the states and their subdivisions. The plaintiffs contended (1) that the expansion of coverage through the "enterprise concept" was beyond the power of Congress under the Commerce Clause, (2) that coverage of state-operated hospitals and schools was also beyond the commerce power, (3) that the remedial provisions of the Act, 29 U.S.C. Secs. 216(b), 216(c), 217, if applied to the States, would violate the States' sovereign immunity from suit guaranteed by the Eleventh Amendment, and (4) that schools and hospitals, as enterprises, did not have the statutorily required relationship to interstate commerce. 392 U.S. at 197, 88 S.Ct. 2017. The Supreme Court rejected the position of the plaintiffs on the first two

of the above issues, and declined to rule on the latter two:

" . . . (W)e decline to be drawn into an abstract discussion of the numerous complex issues that might arise in connection with the Act's various remedial provisions. They are almost impossible and most unnecessary to resolve in advance of particular facts, stated claims, and identified plaintiffs and defendants. Questions of state immunity are therefore reserved for appropriate future cases. . . . Whether particular institutions have employees handling goods in commerce . . . may (also) be considered as occasion requires."

392 U.S. at 200–201, 88 S.Ct. at 2026.

In *Briggs v. Sagers* (10th Cir. 1970), 424 F.2d 130, *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59, the question of state immunity to suit under the FLSA as amended in 1966 came before an appellate court of the United States for the first time in the context of a particular controversy. Suit was brought under 29 U.S.C. Sec. 216(b), one of the "remedial provisions" of the Act, by employees of a Utah-owned institution for the treatment of the mentally deficient. The State of Utah pleaded sovereign immunity, and was granted a dismissal by the District Court. On appeal, the plaintiffs-appellants argued that Utah should be deemed to have waived its immunity, citing the doctrine of "implied consent to suit", as espoused in *Parden v. Terminal Railway of Alabama State Docks Depart-*

one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employees shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and

the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection."

*ment,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). The holding of *Parden* was that by engaging in interstate railroading twenty years after the Federal Employers' Liability Act was enacted, the State of Alabama had impliedly waived its immunity to private suits under that Act. The State of Utah contended that the doctrine of *Parden* should not be applied, because Utah had been operating the institution in question *prior to* the passage and effective date of the 1966 amendments to the Fair Labor Standards Act and could therefore not be said to have waived its immunity. The Tenth Circuit Court of Appeals did not agree, and it held the State of Utah amenable to suit on the theory of implied consent.

"(W)e think the express intent of Congress and the language of Parden must control the matter. The regulatory power of Congress, although limited to constitutionally defined matters, *e. g.,* interstate commerce, is plenary to those matters. Since the FLSA was enacted through the authority of the Commerce Clause, and inasmuch as the *right of action* imposed by the FLSA is fully within the congressional regulatory power, it would be incongruous to deny Congress the power to name a prompt effective date for (amendments to the FLSA). To suppress that corresponding power would run counter to the plenary nature of the constitutionally defined regulatory authority and could, in part, defeat the purpose of urgently required legislation."

424 F.2d at 133 (footnotes omitted).

*Briggs v. Sagers* is squarely applicable to the facts of the instant case, in that the plaintiffs here seek relief under 29 U.S.C. Sec. 216(b) and are employees of a state-owned institution which was in operation before, and continued in operation after, the 1966 amendments to the FLSA. Briefs which the parties have submitted on the issue of sovereign immunity show me no convincing reason for not following the *Briggs* decision.

Accordingly, I hereby adopt all relevant portions of said opinion as the law of this case. Specifically, I find that the State of Rhode Island, by having continuously operated the Patrick I. O'Rourke Children's Center after the February 1, 1967 effective date of the 1966 amendments to the FLSA, has waived *its immunity and consented to* suits permitted by the Act, including the instant suit.

*Compensability*

The "hours" in controversy here, i. e., the allegedly uncompensated time for which the plaintiffs claim overtime compensation, are characterized in the stipulation of facts:

"... (T)he Plaintiffs work actively 6 p. m. to 10 p. m., then are inactive from 10 p. m. to 6 a. m. when the Plaintiffs may sleep or do incidental things. The Plaintiffs then awake at 6 a. m. and work actively to 10 a. m.

... The Plaintiffs must stand by from 10 p. m. to 6 a. m. and may not leave the premises, except by special permission.

... Between the hours of 10 p. m. and 6 a. m., the Plaintiffs must tend to sick, emotional or runaway children, or attend to any problem which arises with said children during that time period."

The "sleeping" or "standby" hours of 10 p. m. to 6 a. m. are the particular hours in dispute.

In *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Supreme Court discussed criteria for determining whether "waiting time" is to be considered compensable "working time";

"[W]e hold that no principle of law found either in the (Fair Labor Standards Act) or in Court decisions precludes waiting time from also being working time. We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many

situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. . . . This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that an employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was."

323 U.S. at 136–137, 65 S.Ct. at 163.

As for the "arrangement" in the instant case, I make the following findings of fact, based on testimony at trial, documentary evidence and stipulations of counsel.

The Patrick I. O'Rourke Children's Center is a "shelter" facility for the children of Rhode Island. It serves a total of about 800 children in a typical year, and has an average population of about 200 children. The staff of the Center numbers 115, and the physical plant consists of 17 buildings, 11 of which are "cottage" residences for the children.

The determination for commitment to the Center is generally made by the Family Court, although some "shelter" cases are sent directly to the Center by the police. Children admitted to the Center have ranged in age from one week to eighteen years. The population of the Center typically includes "problem children," sick children, mentally retarded children, abandoned infants, and children referred by the Rhode Island Training School for Boys, a state reformatory.

The children, grouped according to age, are under the 24-hour care and supervision of "Youth Home Life Supervisors," "House Parents," and "Senior House Parents." The Youth Home Life Supervisors work an eight-hour shift, 10 a. m. to 6 p. m., and the House Parents and Senior House Parents are responsible for the balance of the day. All of the instant plaintiffs are House Parents or Senior House Parents.

Senior House Parents and House Parents go on duty at 6 p. m. and work "actively" until 10 p. m., then begin an eight-hour "standby" period which lasts until 6 a. m. At 6 a. m. they commence "active" work again, and at 10 a. m. they go off duty and are free to leave the premises. Their 16-hour workday consists of a total of eight "active" hours and eight "standby" hours.

During the nighttime standby hours, House Parents and Senior House Parents (henceforth lower case "house parents," unless reference to only one of the two classes of house parents is intended) are required to remain at their cottages, but are permitted to sleep as circumstances permit. Each house parent is provided with a fully furnished bedroom including linen and a bathroom. He is not required to leave his room during the night if his services are not needed, but if a child does need care at any time he must provide it. House parents can apply for compensation for any time spent caring for children during the night; such time is compensated at a time-and-one-half rate.[3]

Three plaintiffs testified as to the extent of interruptions during the standby period. One stated that between 1968 and 1971 he was required to leave

---

3. This compensation is based on an hourly rate determined in the manner described at 1282 *infra*.

his room "on a few occasions," and at another point in his testimony he stated that he is "often" required to do so. He added that he has trouble sleeping because of his concern about his responsibility for the care of the 23 boys in his cottage.

Another plaintiff, Celia Anderson, stated that she is in charge of the cottage providing emergency shelter; that children of all ages come in "at all hours" of the night; and that she gets up "almost every single night," but has never put in for extra compensation.

The third plaintiff, William Silvestri, cares for children between 14 and 18 years of age. Some of his charges are mentally retarded, some are "problem children," and some come from the Training School for Boys. He stated that he cannot go to bed before 1 a. m. because if he does, "they're going out those windows." Once or twice he submitted memos to be paid for nighttime care, and on such occasions he was in fact paid.

The court, noting the variety of experience indicated by the testimony summarized above, concluded that, in the absence of a stipulation or additional evidence, it could not generalize as to the frequency of calls to duty for *all* the plaintiffs. Accordingly, at a post-trial conference in chambers, the court invited the plaintiffs to produce such additional evidence. The plaintiffs, however, stated through counsel that such evidence was not available and that they preferred to rest on the case as already presented. I must find, therefore, that to the extent it may be determined, *infra*, that specific evidence of the frequency of "calls" during the standby hours is essential to the success of plaintiffs' case, the plaintiffs have not met their burden of production as to those plaintiffs who did not testify.

Eighteen of the plaintiffs hold the position of Senior House Parent, and the remaining two plaintiffs are House Parents. The responsibilities of a House Parent are substantially the same as those of a Youth Home Life Supervisor; except that a House Parent works a split evening-morning shift and is required to "sleep-in" four nights a week. A Senior House Parent has more supervisory and management responsibility than a House Parent or a Youth Home Life Supervisor, and is required to sleep in five nights a week.

Youth Home Life Supervisors and House Parents are salaried employees, compensated in accordance with a system of pay "grades" by which certain positions in the State employ are rated. Pay grades are expressed as ranges of yearly salary. The position of Youth Home Life Supervisor is compensated at "Grade 9" or "Grade 10" level. "House Parent" is rated at Grade 11, a higher pay range. Senior House Parents receive an even higher Grade 12 salary.

According to testimony of the defendants, House Parents are rated higher on the pay scale than Youth Home Life Supervisors because of the requirement that they sleep in and remain on call four nights a week. (The fact that the "active" working hours of House Parents are scheduled at a less desirable time of day was *not* cited as a principal reason for the higher pay grade. House Parents and Senior House Parents receive extra compensation of 10¢ an hour over and above their "graded" salaries for the "active" work hours of 6 to 10 p. m., in accordance with a State government policy that such a bonus be paid to employees required to work during the evening.)

The position of Senior House Parent was formally created in 1969, as a recognition of extra responsibilities carried by certain "head" House Parents. At that time a group of 22 or 23 House Parents were promoted into the new job classification and advanced to Grade 12 salary level. Mr. Spinelli, Superintendent of the Center and a defendant here, testified that the extra pay resulting from the Grade 12 classification was intended as compensation for

the five nights of standby duty and the heavy load of responsibility carried by Senior House Parents. Mr. Ricci, Assistant Director for Community Affairs in the Department of Social and Rehabilitative Services, testified that it was felt that Senior House Parents deserved "substantial monetary recognition" because of the responsibilities of the job, the required sleeping hours, the split shift arrangement, the fact that Senior House Parents were usually man and wife, and the fact that they were required to work every weekend.

Inescapable is the conclusion that the sleep-in requirement was a significant factor in defendants' decision to place House Parents and Senior House Parents in higher pay brackets than Youth Home Life Supervisors, and that the defendants recognized that nighttime standby time was worthy of some compensation and intended that it receive such compensation.

Although the establishment of the current pay levels for House Parents and Senior House Parents was not by written agreement between the Children's Center and its employees, I do find that there was extensive employee participation in, and influence on, the decision-making process. House Parents expressed dissatisfaction over wages as early as 1965, and negotiating sessions attended by House Parents and officials of the Center were held from time to time over the next four years. I find that the ultimate placement of House Parents and Senior House Parents in higher pay categories was not a unilateral declaration of policy by the Center, but was rather by "arrangement" between employer and employees; it reflected a conscious understanding by all the parties that "sleep-in" time was to be compensated by payment of Grade 11 and Grade 12 salaries to House Parents and Senior House Parents, respectively, as opposed to Grade 9 or 10 for Youth Home Life Supervisors.

4. This fact was stipulated by the defense at the conclusion of the trial.

Although, as testified by Mr. Ricci, the sleeping time of House Parents is "included in their pay grade," House Parents are carried on the records of the State as 40-hour-a-week employees. Payroll records and job descriptions show only the "active" working hours as compensated working time. When a house parent applies for time-and-one-half compensation for nighttime work, his hourly rate is determined by dividing his weekly salary by the number of "active" hours normally worked. On a "bookkeeping" level, then, the sleeping time of House Parents is deemed not compensated.

Finally, in view of the language of *Skidmore v. Swift, supra,* I must note at this time that the monetary compensation received by house parents is their *entire* compensation. Specifically, the sleeping quarters occupied by House Parents are provided as a "facility of the task," and are not intended as compensation.[4] House Parents maintain homes off the grounds of the Children's Center, and are not permanent residents of the Center.

On the basis of the foregoing evidence, I find that the compensation of the plaintiffs covers "both waiting and task," rather than "only performance of the task (giving care during the night) itself." The plaintiffs were engaged to wait; they did not wait to be engaged. The nighttime standby hours of the plaintiffs is compensable time under the provisions of the Fair Labor Standards Act.

The conclusion that plaintiffs' sleeping time is compensable is compelled not by any single item of evidence, but rather by the particular combination of circumstances constituting the "arrangement" here: the fact that house parents are required to remain on their employer's premises during their standby hours: that house parents do not permanently live on the premises, but rather sleep there as part of their duty and not as a matter of choice;[5] that house parents

5. Cf. *Rural Fire Protection Company v. Hepp* (9th Cir. 1966), 366 F.2d 355.

are paid a higher salary than other employees who have equal responsibility but no sleeping duty; that the employers admit their intention to compensate the house parents for their sleeping time; and that a tacit understanding exists between employer and employees regarding the compensability of sleeping time.

Distinguishable are the numerous cases in which sleeping time of "on call" firemen has been held noncompensable because of a failure of the plaintiffs to prove that their sleeping hours were subject to frequent interruptions. *See Rokey v. Day & Zimmerman* (8th Cir. 1946), 157 F.2d 734, *cert. denied* 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288; *Bowers v. Remington Rand* (7th Cir. 1947), 159 F.2d 114, *cert. denied* 330 U. S. 843, 67 S.Ct. 1083, 91 L.Ed. 1288; *Plummer v. Harvester War Depot* (N.D. Ohio 1947), 70 F.Supp. 495; *Bridgeman v. Ford, Bacon & Davis* (E.D.Ark.1946), 64 F.Supp. 1006. In most of these cases there was an express agreement between employer and employees that sleeping hours were not to be compensated. Cf. *General Electric Co. v. Porter* (9th Cir. 1954), 208 F.2d 805, *cert. denied* 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097. Additionally, I find an essential dissimilarity between the "on call" duty of firemen and the standby duty of the instant plaintiffs. A fireman on night call is more completely relieved of responsibilities during his periods of waiting. No benefit beyond his bare presence flows to his employer during such idle hours. The fireman is free to direct his thoughts and attentions wherever be may choose, until the alarm bell calls him into action. A house parent, on the other hand, has, as the evidence shows, a continuing responsibility for the care of a group of children. His job requires more of a constant vigil, more of an ongoing exercise of judgment. The stimuli to which he may have to respond during the night are more complicated and subtle than an alarm bell. To the house parent falls the duty of perceiving an emergency in the first instance; a fireman is required only to respond to an alarm signalling an emergency already perceived by another. With the duty of maintaining peace and quiet in his cottage throughout the night, the house parent is responsible even for the *prevention* of emergencies: the fireman "on call" has no such responsibility. It is clear from the very nature of the house parents' duties that the Children's Center benefits substantially from their presence during the standby hours. For this reason, and because of the understanding of the plaintiffs and defendants that the standby hours were worthy of compensation in the form of pay grade increases, I find that the plaintiffs were "engaged to wait" *even though* evidence of the frequency of calls to duty during said standby hours was not produced as to every plaintiff.

Nevertheless, for purposes of appellate review, I specifically find that the evidence produced as to plaintiff Celia Anderson is sufficient to establish "frequent interruption" under the tests of the "fireman" cases, *supra*. I find plaintiff Anderson's standby time of eight hours a night compensable under any construction of existing case law. As for plaintiff William Silvestri, I find that his standby time is subject to "frequent interruption" during the first three hours of every standby period. As for the other plaintiff who testified, and the plaintiffs who did not take the stand, I do not find evidence of "frequent" calls to "active" work during the standby hours. I reiterate that for the reasons set forth, *supra*, I do not consider such evidence essential to plaintiffs' case.

A finding of compensability in the instant case is consistent with the applicable sections of the Code of Federal Regulations; 29 CFR Secs. 785.20 and 785.-21, under the heading "Hours Worked—Sleeping Time and Certain Other Activities," provide as follows:

"Sec. 785.20 General.

Under certain conditions an employee is considered to be working even

though some of his time is spent in sleeping or in certain other activities.

Sec. 785.21 Less than 24-hour duty.

An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. A telephone operator, for example, who is required to be on duty for specified hours is working even though she is permitted to sleep when not busy answering calls. It makes no difference that she is furnished facilities for sleeping. Her time is given to her employer. She is required to be on duty and the time is overtime. (*Central No. Telephone Co. v. Conwell*, 170 F.2d 641 (C.A.8, 1948); *Strand v. Garden Valley Telephone Co.*, 51 F.Supp. 898 (D.Minn.1943); *Whitsitt v. Enid Ice & Fuel Co.*, 2 W.H. Cases 584; 6 Labor Cases para. 61,-226 (W.D.Okla.1942))"

Under the Code of Federal Regulations, such considerations as "interruptions of sleep" come into play only when an employee is required to be on duty for 24 hours or more. 29 CFR § 785.22. As noted, *supra*, the instant plaintiffs are on duty only for 16 hours.

Rulings, interpretations and opinions of the Administrator of the Wage and Hour Division are not controlling on the courts, but they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, *supra*, 323 U.S. at 140, 65 S.Ct. at 164. Without undertaking an analysis of the provisions of the Code of Federal Regulations set forth, *supra*, and without relying on said provisions as the grounds for my decision, I note only that the statutory interpretations of the Ad-ministrator incorporated therein are not inconsistent with the result reached here.

*Statute of Limitations*

The defendants have pleaded the statute of limitations as an affirmative defense to plaintiffs' claims. The applicable provisions are found in the Portal-to-Portal Act of 1947, §§ 6, 7, 29 U.S.C. §§ 255, 256:

"Sec. 255. Statute of Limitations

Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

(a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

. . . ."

"Sec. 256. Determination of commencement of future actions

In determining when an action is commenced for the purposes of section 255 of this title, an action commenced on or after May 14, 1947 under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, or the Bacon-Davis Act, it shall be considered to be commenced in the case of any individual claimant—

(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and

his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

(b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced."

The original complaint in the instant action, naming sixteen individuals as plaintiffs, was filed on March 1, 1971. The complaint was amended on October 26, 1971 and November 8, 1971, as two additional pairs of plaintiffs were added. A written consent signed by all plaintiffs was filed on November 8, 1971.

It has been widely held that when an action for recovery of unpaid minimum wages or unpaid overtime compensation is commenced by a number of employees in their individual capacities and for their own individual benefits respectively, it is not an action "for and in behalf of . . . (the named plaintiffs) *and other employees similarly situated,*[6] and is not a "collective" action within the meaning of 29 U.S.C. § 256. *Gray v. Swanney-McDonald, Inc.* (9th Cir. 1971), 436 F.2d 652, *cert. denied* 402 U.S. 995, 91 S.Ct. 2173, 29 L.Ed.2d 161; *Deley v. Atlantic Box & Lumber Corp.* (D.N.J. 1954), 119 F.Supp. 727 (distinguishing *Burrell v. La Follette Coach Lines* (E.D. Tenn.1951) 97 F.Supp. 279); *McDonald v. Martinelli* (S.D.N.Y.1953) 120 F.Supp. 382. *See also Wallace v. Water Tank Service Company* (W.D.Okla.1966) 256 F.Supp. 689; *Mitchell v. Mace Produce Company* (D.Md.1938), 163 F.Supp. 342.

The instant complaint was filed by sixteen named plaintiffs (later twenty); it states a separate cause of action for each plaintiff, although all causes of action are joined in a single complaint, as authorized by Rule 20(a), Federal Rules of Civil Procedure. The language of the complaint in no way in-

dicates that any plaintiff sues other than in his own exclusive behalf. The first ten paragraphs of the amended complaint set forth facts common to, and giving rise to, the separate causes of action. The remaining twenty paragraphs contain allegations of the damages separately sustained by the individual plaintiffs.

I can conclude only that this action was brought by the plaintiffs exclusively for their individual benefits, and that it is not a "collective" action within the contemplation of 29 U.S.C. § 256. For purposes of the statute of limitations, 29 U.S.C. § 255, this action shall be deemed to have been commenced on the date the complaint was filed. For the sixteen original plaintiffs, March 1, 1971 is the date the action was commenced. As for the other four plaintiffs, their independent causes of action were first introduced into the case on the dates the amendments stating their claims were filed, and the statute of limitations was tolled as to them on paid dates. 51 Am.Jur.2d Sec. 236; *Athas v. Day* (D.Colo.1958), 161 F.Supp. 916.

The limitation period prescribed by 29 U.S.C. § 255 is two years, unless the cause of action arose out of a "willful" violation. The term "willful" applies in civil actions, to violations which are intentional, knowing or voluntary, as distinguished from accidental; it is used to characterize intentional disregard of or plain indifference to statutory requirements. *United States v. Illinois Cent. R. Co.*, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938); *Hodgson v. Hyatt* (N.D.Fla.1970), 318 F. Supp. 390. I cannot infer from the evidence presented in the instant case that defendants' violations of the overtime provisions of the Fair Labor Standards Act were "willful."

The plaintiffs, then, are barred from maintaining all but those causes of ac-

---

6. *Cf.* 29 U.S.C. Sec. 216(b), *supra,* and the language therein describing the type of case

for which the written consent of all plaintiffs is required.

tion which "accrued" within two years before the respective filing dates of said actions. A separate cause of action for overtime compensation "accrues" at each regular payday immediately following the work period during which the services were rendered and for which the overtime compensation is claimed. *Mitchell v. Lancaster Milk Company* (M.D.Pa.1960), 185 F.Supp. 66; *Shandelman v. Schuman* (E.D.Pa.1950), 92 F.Supp. 334. The sixteen original plaintiffs can recover only that portion of the claimed overtime compensation which became due on regular paydays falling on or after March 2, 1969. The recovery of the plaintiffs added on October 26, 1971 and November 8, 1971 is similarly limited to rights accruing on paydays falling on or after October 27, 1969 and November 9, 1969, respectively.

### *"Regular Rate"*

This case has been tried to date on the issue of liability only. The presentation of evidence pertaining to damages is to be deferred pending stabilization of the basic liability status of the parties by appellate review. The ascertainment of overtime compensation owed to twenty plaintiffs for period of up to two years must necessarily entail a time-consuming and complicated accounting process, which might best proceed under the supervision of a special master.

However, in the interest of resolving all legal issues ripe for decision at this point, I address myself now to one aspect of damages.

The evidence in the case showed that the plaintiffs were compensated for their overtime hours by placement in higher pay brackets than other employees who did not have overtime duty. Such compensation was, of course, inadequate to the extent that it was not paid at an hourly rate which was at least one and one-half times the hourly rate paid for the forty "active" hours worked by each plaintiff every week. The calculation of damages involves the determination of the amount of this inadequacy as to each individual plaintiff.

The overtime compensation owed any plaintiff will be assessed, in accordance with the statutory requirement, at a rate which is one and one-half times his "regular rate." I note that an hourly rate is "available" for each plaintiff; it is the hourly rate at which he is carried on state employment records. As explained, *supra* at 1282, said rate is determined by dividing total weekly compensation by total "active" hours worked. As such, this rate is unsuitable as the "regular rate" for purposes of damages, because it attributes *all* compensation to the forty "active" hours, and is thereby inconsistent with my finding that a portion of each plaintiff's compensation was in fact for his overtime hours.

The procedure by which damages are assessed must incorporate a recognition that the amount by which each plaintiff's pay exceeded that of a Youth Home Life Supervisor was partially or completely attributable to the overtime hours. The simplest, and probably the most equitable, way to accomplish this purpose is to use as each employee's "regular rate" the hourly rate of a Youth Home Life Supervisor of equivalent status. The use of such a rate achieves an apportionment of plaintiffs' pay between "regular" and overtime hours in accordance with the facts as I have found them, and allows the defendants credit for amounts that were intended as compensation for overtime.

The plaintiffs are entitled to recover from the defendants as set forth in this opinion. Accordingly, it is *hereby ordered* an interlocutory judgment be entered for the plaintiffs. It is further ordered an accounting be made to determine the amount of such damages and costs, its commencement, however, to await the conclusion of any appellate

proceedings taken from this interlocutory judgment or until the expiration of the time for the taking of an appeal therefrom, whichever shall last occur.