W. J. USERY, Jr., Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

GODWIN HARDWARE, INC., a
corporation, et al., Defendants.

Civ. A. No. G 53-73.

United States District Court,
W. D. Michigan, S. D.

Dec. 16, 1976.

John C. Nangle, Detroit, Mich., for plaintiff.

Terry J. Mroz and Michael F. Kelly, Grand Rapids, Mich., for defendants.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

MILES, District Judge.

This action is before this court on plaintiff's motion for summary judgment. This court has determined that said motion should be granted; now therefore this court hereby makes the following findings of fact and conclusions of law:

### Findings of Fact

1. There is no genuine issue as to any of the facts found herein or any fact material to the theory of the case advanced by the plaintiff's motion and upheld herein by this court.

2. This is an action filed on March 1, 1973, under section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, *et seq.*), hereinafter called the Act, to enjoin and restrain the defendants from violating the minimum wage, overtime pay, and recordkeeping requirements contained in sections 6 and 15(a)(2), sections 7 and 15(a)(2), and sections 11(c) and 15(a)(5) of the Act, respectively, including the restraint of the continued withholding of back wages due as a result of such violations since March 1, 1970. The plaintiff is the duly authorized Secretary of Labor, United States Department of Labor. The defendants are (a) Godwin Hardware, Inc., a Michigan Corporation, hereinafter called "Godwin Hardware"; (b) Godwin Plumbing, Inc., a Michigan Corporation, hereinafter called "Godwin Plumbing"; and (c) Marvin (Red) R. Brummel, hereafter called "Brummel", as follows: i) individually, ii) doing business as "Godwin Plumbing Company" prior to the incorporation of Godwin Plumbing, and as "Godwin Hardware & Plumbing Company" prior to the incorporation of Godwin Plumbing and Godwin Hardware, iii) as an officer of Godwin Hardware, and iv) as an officer of Godwin Plumbing.

3. Beginning in about 1955 and continuing thereafter, Brummel owned (as sole proprietor) and operated a hardware business engaged in the purchase and resale of nails, paint, tools, pipe, plumbing supplies, hardware generally, and other goods and a plumbing business engaged in the construction, reconstruction, installation, repair, and maintenance of plumbing and plumbing systems, all under the name "Godwin Hardware & Plumbing Company."[1] This contin-

---

1. The name "Godwin Hardware and Plumbing Company" was used for some purposes at all times, before and after the incorporation of Godwin Hardware and/or Godwin plumbing.

ued until on or about September 29, 1967, when the hardware business was incorporated as Godwin Hardware, Inc., which assumed the assets and liabilities of the hardware business and continued said business, with Brummel continuing the plumbing business as a sole proprietorship under the name "Godwin Plumbing Company." These continued until on or about June 30, 1970, when the plumbing business was incorporated as Godwin Plumbing, Inc., which assumed the assets and liabilities of the plumbing business and continued said business. During the period September 29, 1967, to June 30, 1970, in respects not pertinent to the violation aspects of the application of the Act in this case, portions of the plumbing business were carried on by employees of Godwin Hardware with reimbursement from the Godwin Plumbing Company sole proprietorship. Hereinafter, the hardware business, as owned and operated either by the sole proprietorship or by Godwin Hardware, will be sometimes referred to as the "hardware business"; and the plumbing business as operated either by the sole proprietorship or by Godwin Plumbing, will be sometimes referred to as the "plumbing business". Bearing in mind their respective periods of existence and which of the businesses they owned, the defendants listed in subparagraphs 2(a), 2(b), and 2(c)(ii) above are sometimes hereinafter collectively called "Godwin."

4. From the incorporation of Godwin Hardware to date, Brummel has continued his full ownership status in the hardware business by owning 100 percent of the stock of Godwin Hardware; and from the incorporation of Godwin Plumbing until on or about May 23, 1972, Brummel continued his full ownership status in the plumbing business by owning 100 percent of the stock of Godwin Plumbing. On or about May 23, 1972, 15 percent of the stock of Godwin Plumbing was sold to each of four employees of the plumbing business,[2] with Brummel retaining the remaining 40 percent;

and the ownership situation of Godwin Plumbing has remained unchanged since said sale. One of the four employees is Mr. Edward Vanderwal, hereinafter called Mr. Vanderwal, who was Godwin's office manager-bookkeeper at all times material hereto and was an officer of and a director of Godwin Plumbing at all times material hereto.

5. Since their respective incorporations, Brummel has been both president and a director of both Godwin Hardware and Godwin Plumbing. At all times material hereto, he has been the person in charge and has been actively engaged in directing the affairs of the hardware business and the plumbing business, including actively setting, and participating in the implementation of, the policies as to wages, hours, and conditions and practices of employment in the hardware business and the plumbing business.

6. At all times material hereto Godwin employed all the employees employed in the hardware business and all the employees employed in the plumbing business. The employees employed in the hardware business were employed by Godwin Hardware as principal employer; and the employees employed in the plumbing business were employed by Brummel's sole proprietorship Godwin Plumbing Company as principal employer until the incorporation of Godwin Plumbing and were employed by Godwin Plumbing as principal employer after the incorporation of Godwin Plumbing.

7. A special pay system (hereinafter called the 2-rate system) was used by Godwin for paying some of its employees. The 2-rate system and the nature and scope of its use in the plumbing business through July 19, 1972, is explained in paragraph 7 through 38 hereof and the nature and scope of its use in the hardware business through June 28, 1972, is explained in paragraph 40 hereof.

8. In the plumbing business, the 2-rate system was used during the period from

---

**2.** The four employees were all made aware of the plaintiff's investigation in progress at the time of the purchase. No cash payment was made at the time of the sale; the employees gave their promissory notes in exchange for the stock they received.

workweek ending September 14, 1965 through workweek ending July 19, 1972, and during that period was used for all hourly-rated employees, with 3 types of limited exceptions.[3] The 2-rate system began under Brummel's sole proprietorship of the plumbing business and continued, under the direction and control of Brummel, after the incorporation of the plumbing business.

9. Each employee employed under the 2-rate system had, during any given workweek, 2 hourly rates which are hereinafter called the "lower rate" and the "higher rate", respectively.

10. At the end of any given workweek, the employee was paid compensation which was the sum of: (1) an amount equal to the lower rate times the number of hours worked in the workweek up to and including 40 hours, and (2) if the employee worked in excess of 40 hours in the workweek, an amount equal to (or less than [4]) one and one-half times the lower rate times the number of hours worked in the workweek in excess of 40 hours. These two amounts were recorded at the end of the workweek in two separate unlabelled columns (i.e., in the first two earnings columns, which are columns 6 and 7) in the payroll records of the plumbing business, and the sum of them (after adding in any other payment in column 8 paid that week) was recorded at the end of the workweek is

still another unlabelled column (i.e., in the last earnings column, which is column 9) in said records and paid to the employee at the end of the workweek.

11. Shortly after the end of each calendar quarter,[5] or sooner sometimes if the employee had left the employ of Godwin before the end of the quarter, two special amounts were determined: (1) the first special amount was equal to the higher rate times the sum of all hours worked by the employee in the workweeks ending in the quarter, and (2) the second special amount was equal to the sum of all the weekly payments[6] in the first unlabelled column (column 6) referred to in the preceding paragraph for all the workweeks ending in the quarter and in the second unlabelled (column 7) referred to in the preceding paragraph for all workweeks ending in the quarter. Then the first such special amount was compared to the second, the difference, hereinafter called the "make-up accrual," was generally entered in the payroll records of the plumbing business, as follows: if the first was higher, the difference was entered in an unlabelled marginal space (generally in or about column 1) in said records to show the amount due *to* the employee from Godwin for the quarter; and if the second amount was higher, the difference was entered in an unlabelled marginal space (generally in or about col-

3. The 3 types of exceptions were: 1) a temporary exception which involved only 5 employees newly-hired in 1970 as explained in paragraphs 26 through 28 hereof; 2) a temporary exception which involved only 2 other employees as explained in paragraph 29 hereof; and 3) an employee hired May 1, 1972, after the onset of an investigation by the plaintiff, *infra*. The latter employee was hired at $2.50 per hour as a "plumber"—for less than the rate usually paid plumbers perhaps because he was a trainee.

4. The defendants claim that Brummel personally was not aware at the time that as to weekly payments sometimes some employees were paid less than one and one-half times the lower rate times the hours worked in excess of 40 hours in the workweek and that Mr. Vanderwal caused Godwin to engage in this practice without the knowledge or express approval of Brummel personally—though a simple exami-

nation of the payroll records of the plumbing business would reveal this practice.

5. For at least the first two calendar years the 2-rate system was used in the plumbing business, the make-up accruals explained *infra* in these findings were paid annually rather than quarterly. During the period annual payments were the practice, the last calendar quarter of the calendar year was closed for purposes of the 2-rate system shortly before Christmas (and the first calendar quarter of the following calendar year was opened at the same time) and it is unknown whether notations in the payroll records of quarterly make-up accruals were made quarterly or only at the end of the year shortly before Christmas.

6. Exclusive of any payments labelled as "P.S.", as "Xmas Bonus", "Xmas B", "Xmas", or "Bonus", or as "B", and of any payments of make-up accruals (whether or not labelled "B"), all of which are explained *infra*.

umn 1) in said records as the make-up accrual due *from* the employee to Godwin for the quarter. Godwin also then gave the employee a written statement of the amount of the make-up accrual due to or from him and of the computation by which it was arrived at.

12. The payment of the make-up accrual due to or from the employee results in the hourly compensation received by the employee being equal to only straight time compensation at the higher rate for all hours worked in the quarter, including hours worked in excess of 40 in any given workweek. Such payment of the make-up accrual and this result thereof was contemplated by and agreed to by Godwin before the work was performed by the employee.

13. No employee ever failed to receive from Godwin the payment of all make-up accruals due to him under the 2-rate system, even if he left the employ of Godwin before the end of the quarter during which they accrued or before the make-up accrual for the quarter had been actually computed; nor was an employee permitted to leave the employ of Godwin without any make-up accrual due from him being paid [7] to Godwin, at least generally by a subtraction from his pay.

14. Each employee paid under the 2-rate system fully understood, and understood before the performance of any work under the 2-rate system, how the 2-rate system worked and that the policy of using it applied to him.

15. When the 2-rate system was initiated in September of 1965, Brummel sent a letter to all the hourly-rated employees employed at that time in the plumbing business explaining the 2-rate system and announcing the policy of applying the 2-rate system to all such employees. The letter read in part as follows:

all hourly rated employees will be reduced fifty cents (50¢) per hour and will be paid time and one-half over forty (40) hours in a week. Any differences caused by the above changes will be corrected at the end of the year. This means that you will receive the same earnings as before except that the distribution of your earnings will be handled differently.

From time to time thereafter, principally at regular quarterly meetings with the employees employed in the plumbing business, Brummel reiterated this policy. None of these employees was ever told of any change or revocation of the statement of policy contained in the letter until July 19, 1972, when all employees were notified of the revocation of said system (with a payment of make-up accruals in or about August of 1972 to cover make-up accruals due for the period up to July 19, 1972, not yet paid).

16. When a person was newly hired as an hourly-rated employee for work in the plumbing business,[8] the 2-rate system was explained to him in detail and the fact that it would apply to him was made clear to him. He was hired in reference to a specific higher rate, and he was also told what his lower rate would be.

17. From time to time, an employee paid under the 2-rate system received an increase in pay rates. When such an increase was given, both the higher rate and the lower rate were increased at the same time; and the employee was told what his new higher rate and new lower rate were to be. Generally the increase was the same number of cents per hour for each of the rates; but on occasion the lower rate would be increased by a lesser amount than the higher rate.

18. Under the 2-rate system, make-up accruals due from an employee were treated as a debt owed by the employee to

---

7. The abandonment of the practice of making marginal notations of the amount of make-up accruals due at the end of the quarter may have resulted in Tom Damstra leaving without paying $13.96 in make-up accruals due from him; and Donald Piebenga was given a credit

of $60.00 against the last make-up accruals due from him though the credit is not otherwise shown.

8. Except the five employees referred to in the first part of footnote 3, *supra.*

Godwin; and Godwin wished to avoid any risk that an employee might leave the employ of Godwin without paying the make-up accruals due from the employee. For this reason, steps were taken to avoid having make-up accruals due from rather than to an employee, as follows: 1) by on occasion making an increase in the lower rate less than an increase in the higher rate, and 2) by on occasion computing, paying, and entering in the second earnings column (column 7) for a workweek an amount even less than one and one-half times the *lower* rate for the number of hours in excess of 40 worked in the workweek by the employee.[9]

19. When a change in the rates occurred during rather than at the start of a calendar quarter, make-up accruals for hours worked prior to the increase were computed using the higher rate in effect prior to the increase and make-up accruals for hours worked after the increase were computed using the higher rate in effect after the increase.

20. The aforesaid letter dated September 14, 1965, announcing the adoption of the 2-rate system, stated that the payment of make-up accruals due to an employee would be paid "at the end of the year." Sometime after the first two calendar years the 2-rate system was used in the plumbing business but before 1970, the policy of paying regularly each quarter the make-up accruals due to an employee was adopted. However, at least by 1970, in practice and without a formal change in policy, the payment of make-up accruals due as computed at the end of the quarter was sometimes delayed until the end of the next quarter when it could be combined with the payment of make-up accruals due to the employee computed for work performed in that next quarter; but no such delay occurred if the employee objected to the delay. When such a delay did occur, the computation of that portion of the combined amount attributable to each quarter was separately explained to the employee when the payment was made even though the payment of the combined amount was shown on a single line in the payroll records of the plumbing business and was paid with a single payroll check to the employee.

21. When the computation of the make-up accruals due, as computed at the end of the quarter, showed make-up accruals due from rather than to an employee and there were no make-up accruals unpaid from a prior quarter from which they could be subtracted, the make-up accruals due from the employee was subtracted from some payment due to the employee. At least generally speaking, in such cases the payment from which it was subtracted was the payment of make-up accruals due to the employee for the quarter following the one which gave rise to the make-up accruals due from the employee; but at least on occasion, the future payment from which it was subtracted was ordinary weekly pay.

22. The defendants at one time during this litigation claimed that under the 2-rate system any payment of make-up accruals to an employee was payable only at their discretion. However, clarification of the defendants' position has disclosed that the claimed discretion is the discretion, in the event of unexpected business reverses, to terminate *in futuro* the use of the 2-rate system. It concededly would constitute a violation of the defendants' assurances to an employee being paid under the 2-rate system for Godwin to fail to pay any make-up accrual which had accrued for work performed before he was given notice of such a termination of the use of the 2-rate system.

---

**9.** As to one employee employed in the plumbing business, Ivan LaMeyer, amounts computed in terms of one and one-half times the number of hours worked in excess of 40 in a workweek in large part were held back and not paid weekly but were rather paid quarterly. Such amounts were paid as a part of large payments, also covering the payment of make-up accruals at least until July 19, 1972. This practice continued at least until the end of 1973 and differed from the failure to pay weekly (to some of the other employees paid under the 2-rate system) one and one-half times the lower rate times the number of hours worked in excess of 40 in a workweek in 2 respects: 1) the amount of the hold-back was far in excess of that required to assure that there would be no make-up accruals due from the employee, and 2) it continued on a consistent basis even after July 19, 1972.

Moreover, throughout the period since the initiation of the 2-rate system in September 1965, no employee has ever failed to receive payment of all make-up accruals due to him under the 2-rate system—despite the fact that the profitability of the plumbing business varied.

23. In addition to the payment of the hourly compensation for hours worked, inclusive of payments of make-up accruals, an employee employed under the 2-rate system generally received other payments from time to time which were reflected in the first two earnings columns (columns 6 and 7) of the payroll records. Any one such payment fell into one of the following categories: (1) profit-sharing payments (after the adoption of a profit-sharing plan applicable only to the plumbing business and only to fiscal quarters beginning on or after January 1, 1971) labelled as "P.S." payments on the line in the payroll records of the plumbing business which reflects the payment; [10] (2) vacation pay, labelled "V" in the payroll records; and (3) bonuses, generally labelled "Xmas Bonus", "Xmas B.", "Xmas", or "Bonus" (as opposed to "B") while an employee was paid under the 2-rate system on the line in such records which reflects the payment. The plaintiff does not contend in this action that the bonus payments which are not payments of make-up accruals under the 2-rate system or the profit-sharing payments or the vacation pay payments should be included in regular rate computations. All such payments were computed separately and independently from make-up accruals under the 2-rate system and were explained at the time of payment to the employee as having been separately and independently computed. Payments labelled as "P.S." or as "Xmas Bonus", "Xmas B.", "Xmas", or "Bonus" in the payroll records for employees employed under the 2-rate system were paid by separate checks with the check stub given the employee containing the same label as in the payroll records. On the rare occasions [11] when a payment labelled "B" and paid to an employee paid under the 2-rate system did not constitute solely a payment of make-up accruals, any portion constituting a payment of make-up accruals was reflected as a credit (against the make-up accruals due to the employee) in or about column 1 of the payroll records, and it was explained at the time of payment to the employee what portion of the payment constituted a payment of make-up accruals, as well as how they were computed separately and independently from the bonus payment.

24. The onset of the profit-sharing plan came at the time of demands from employees that they be paid one and one-half times their respective higher rates for each hour worked in excess of 40 in a workweek. Mr. Brummel adopted a long-discussed proposal for a profit-sharing plan and rejected these employees' demands. The plan was adopt-

---

**10.** As to the profit-sharing plan: Beginning in the first quarter of 1971 and continuing each quarter since, Godwin Plumbing has had a profit-sharing plan for all of its employees, including those paid under the 2-rate system. At the end of each quarter, a certain percentage of its profits was designated for distribution to or on behalf of its employees. The profits so designated were divided among the employees in accordance with the following formula: For each employee to whom the plan applied, a "points" total was determined by adding (a) years of service since hire, and (b) .01 times total compensation paid in the quarter; then it was determined what percentage an employee's points were of the sum of the points of all employees to whom the plan applied. That percentage was then applied to the total profits designated for distribution to or on behalf of employees to yield the share payable to the employee. The share payable to an employee was then paid to him (a) in a direct payment or (b) in an indirect payment in the form of a payment to the trustees of a pension trust for deposit in the pension plan (which this Court and the parties have presumed, without inquiring into or deciding, meets the requirements for exclusion from regular rate computations under section 7(e)(4) of the Act) to the credit of the employee, or (c) split between such a direct payment and such an indirect payment in accordance with a percentage applicable for splitting the profit-sharing payment for that quarter for each employee to whom the profit-sharing plan applied for that quarter.

**11.** See paragraph 49 hereof for additional findings on this point.

ed to become effective with the first quarter of 1971. Mr. Brummel announced his decision in a letter dated December 11, 1970, sent only to all the employees employed in the plumbing business. In pertinent part, the letter stated:

> For the year 1971, there will be a profit sharing program whereby all employees will share in the anticipated profits: we trust and hope that this would be equal or more than what time-and-a-half would amount to. However, keep in mind that this will be based on profits earned.

25. It was during the period immediately preceding this letter that the first 2 types of exceptions (see footnote 3, *supra*) to the application of the 2-rate system to all the hourly-rated employees of the plumbing business arose.

26. As to the first type of exception: For each of 5 employees newly hired in the summer of 1970, the 2-rate system was not used in 1970 as follows:

| Name | Date Hired |
|------|------------|
| Tom Damstra | 7/ 8/70 |
| Roger Hunderman | 9/20/70 |
| Jeffrey Leep | 6/29/70 |
| Jack Norman | 9/29/70 |
| Roy Velting | 7/13/70 |

Effective with the beginning of the first quarter of 1971, during which the first of the quarterly profits subject to the profit-sharing plan accrued, the 4 employees in this group who were still employed [12] were shifted to the 2-rate system.

27. For the period in 1970 that the 2-rate system was not used for any given employee in this group of 5 employees, the payroll records of the plumbing business do not show 2 hourly rates or any of the other notations characteristic of the ongoing use of the 2-rate system; and on the contrary, they show a notation of "OT", meaning overtime, in the "rate" box at the top of the page in the payroll record, which notation does not occur during periods when an employee was paid under the 2-rate system. When these employees were shifted to the 2-rate system at the end of 1970, 2 hourly rates were established for each of these employees. The hourly rate paid during the period indicated above was established as the higher rate and entered in the "rate" box at the top of the page in the payroll record; and a new, lower rate was established as the lower rate and entered weekly in column 5 in place of what had then become the higher rate. Thus at the time of this shift to the 2-rate system for him, the employee underwent the same sort of change all hourly-rated employees employed in the plumbing business did when the 2-rate system was first adopted in 1965: a reduction in the stated rate shown weekly in the payroll records with continuation of his existing, higher rate for payment at only straight-time compensation for all hours worked—except that in 1965 the employee had not been receiving time and one-half the higher rate for hours worked in excess of 40 in a workweek prior to the change.

28. When the shift to the 2-rate system for this group of 5 employees occurred, meetings between the employees and Brummel occurred at Brummel's request. At the meetings Brummel stated that the payment of hours worked in excess of 40 in a workweek at one and one-half times their hourly rates had been a "mistake" and that Godwin "did not pay time and a half." At the meetings, Brummel explained for the first time to the employees the 2-rate system and that from that time forward they also would be paid under the 2-rate system. Brummel also told each of the employees what his higher rate and his lower rate were to be.

29. As to the second type of exception to the application of the 2-rate system to all the hourly-rated employees employed in the plumbing business: For a short time in 1970 (workweek ending August 26, 1970 through workweek ending November 11, 1970) two such employees (Gilbert Drew and Theodore Sytsema) were temporarily

---

**12.** Jeffrey Leep did not work for Godwin during the period from September 9, 1970 to June 16, 1971, when he was hired again and placed on the 2-rate system.

removed from the 2-rate system and consistent with his employment agreement or understanding, each of these 2 employees did not accrue (during the period he was so removed) any make-up accruals under the 2-rate system as such but did accrue pay at one and one-half times the higher rate shown in the rate box [13] at the top of the payroll records for each hour worked in excess of 40 in a workweek. Sometimes the pay he did so accrue for hours worked in excess of 40 in a workweek was paid weekly; sometimes it was held back and paid as part of a payment of make-up accruals. which had accrued under the 2-rate system either prior to the removal from, or after he was placed back under, the 2-rate system. No additional back wages due under the overtime pay provisions of the Act have been computed or found due here for either of these employees during the period he was removed.

30. An employee who received vacation pay (generally labelled "V" on the line in the payroll records covering the payment) received 40 times his hourly rate as his vacation pay for a week. In the case of an employee being paid under the 2-rate system this was 40 times his higher rate. However, such a payment was shown in the payroll records by splitting it between the first earnings column (column 6) and second earnings column (column 7), with 40 times the lower rate going into column 6 and the balance into the column 7, and 40 hours was shown in the hours worked column (column 5) to reflect the policy of paying vacation pay equivalent to 40 hours of pay. Thus some of the pay was shown in column 7 of the payroll records in a workweek when no hours, let alone any in excess of 40, were worked.

31. In some cases within the period from March of 1970 to July of 1972, the payroll records of the plumbing business designate the higher rate, which was being used to pay an employee under the 2-rate system,

as being the employee's "true" hourly rate of pay.

32. Make-up accruals under the 2-rate system were not gifts nor were they payments in the nature of gifts on special occasions, but rather they were regular periodic payments covering compensation due for and measured by the number of hours worked by the employee. Both the fact that make-up accruals would be paid and the formula and rates for computing the amount thereof were fixed in advance of the employee's performance of the work by Godwin's promise to pay the make-up accruals as part of what the employee would receive as compensation for the work he did for Godwin.

33. The operation of the 2-rate system is illustrated in the exhibit attached hereto, marked "Exhibit A," and made a part hereof, showing the operation of the 2-rate system for calendar year 1971 for employee Dale Bishop.

34. Column 1 of the exhibit shows the calendar quarter. Column 2 shows the method of calculation used at the end of each quarter, as follows:

1.) The top part of columns 2a and 2b for each quarter shows the higher rate calculation, as follows: for each higher rate in effect at any time in the quarter (i.e., in effect in any workweek ending in the quarter), the higher rate is multiplied by the hours worked during the workweeks the higher rate was in effect; and the results are entered in column 2b where they are added up.

2.) The bottom part of columns 2a and 2b for each quarter shows the lower rate calculation, as follows: (a) for workweeks ending in the quarter, the first line adds: i) the total payments computed weekly at the lower rate by reference to the number of hours worked up to 40 in a workweek, and ii) the total payments computed weekly by reference to the number of hours worked in excess of 40 hours in a

---

**13.** Apparently due to a mistake, the hourly rate shown in column 5 in the payroll records was still the lower rate until the beginning of the third quarter; but beginning with workweek

ending August 26, 1970, the "rate" box showed the higher rate "+ OT", meaning plus overtime, as opposed to showing only the higher rate as was done prior thereto.

workweek, and the result of the addition is entered in column 2b; and (b) the payments for bonus (labelled "Xmas Bonus", "Xmas B.", "Xmas", "Bonus") and the payments for profit-sharing (labelled "PS") and payments labelled "B" or identified herein as payments of make-up accruals for prior quarter(s) under the 2-rate system are added and the result entered in column 2b; and (c) the result of the computation in subparagraph 2(b) above is then subtracted from the result of the computation in subparagraph 2(a) above.

3.) The results of the computation in subparagraph 1 above and the computation in subparagraph 2 above are transferred to column 2c, where the latter is subtracted from the former. The result (on the exhibit, negative figures are shown in parenthesis) is transferred to column 2d as the make-up accruals in the quarter due to the employee (from the employee if in parenthesis).

35. The entry in column 2d of the exhibit can be compared to the entry shown in column 3a of the exhibit which shows the make-up accrual shown in the marginal notation in or about column 1 of the payroll records of the plumbing business (with column 3b of the exhibit showing what said payroll records show as such accrual after adjustment for any unpaid balance from prior quarter(s)).

36. Columns 4a and 4b of the exhibit show the date and amount of any payment (in the quarter following the quarter shown in column 1 of the exhibit) of make-up accruals. These dates and the payment in the amount shown in column 4b of the exhibit are those shown in the payroll records of the plumbing business.

37. Column 5 of the exhibit shows the balance of make-up accruals due under the 2-rate system which remain unpaid after any payment in the quarter following the quarter shown in column 1. This balance can be compared to the amount added to the make-up accruals in the next quarter to arrive at the entry for column 3b on the exhibit for the next quarter.

38. Computing, from the payroll records of the plumbing business, back wages for hourly-rated employees paid under the 2-rate system, for the period(s) while so employed, should be done by computing for each hour worked by the employee in excess of 40 hours in a workweek at one half the higher rate in effect for the employee during the workweek to arrive at the back wage figure for such period(s) for each such employee. Computing interest thereon should be done by computing at 6 percent per annum simple interest on the back wage figure for the employee from the midpoint of said period during which back wages accrued for the particular employee to date. Adding the back wage figure for the employee to the interest figure for the employee yields the total figure for the employee.

39. Some of the employees employed in the hardware business were paid on a salary basis, i.e., by the payment of a fixed weekly sum (as shown for each workweek in the payroll records of the plumbing business) for all hours worked in the workweek (regardless of the number of hours worked by the employee in the particular workweek) constituting the employee's total compensation for the workweek and without any extra compensation for any hours worked in excess of 40 in the workweek. This practice began prior to March 1, 1970, and continued until May of 1972. Each employee involved in this practice worked more than 40 hours each workweek; the number of hours worked by the employee varied from workweek to workweek, ranging from about 1 or 2 hours less than the average number of hours worked by the employee per workweek to about 1 or 2 hours more than said average. The employees involved in this practice, the period of employment (by workweek ending dates) during which there was such involvement for the employee, and the average number

of hours worked by the employee per workweek during said period are as follows:

| Name | Period | Hours |
|------|--------|-------|
| Hattie Brummel | 3/5/70-5/23/72 | 43 |
| Roger Driesens | 3/5/70-5/16/72 | 50 |
| Donald Hoorn | 5/19/71-5/10/72 | 50 |
| John Lundquist | 9/15/71-5/10/72 | 50 |
| Kenneth Seinen | 3/5/70-8/25/71 | 50 |
| Kenneth Velthouse | 3/5/70-5/10/72 | 50 |

40. Beginning in May of 1972, when the payroll records began to show an hourly rate and entries in column 7 as well as column 6, at least some of the employees referred to in the preceding paragraph began to be paid on the same 2-rate system with the higher rate earnings being determined at a fixed sum per workweek worked (i.e., at the time of this change, at the *salary* paid immediately prior to the change) rather than at a higher *hourly* rate times the number of hours worked in the workweek. This occurred at least as to employees John Lundquist, Donald Hoorn, and Kenneth Velthouse [14] and continued through the end of the second quarter of 1972.

41. Computing back wages for salaried employees should be done as follows: (a) for the period prior to the appearance of an hourly rate in the payroll records of the plumbing business for them, computing for each hour worked by the employee in excess of 40 hours in a workweek at a rate equal to one-half the rate determined by dividing the fixed weekly sum paid the employee for the workweek (from the payroll records of the plumbing business) by the average number of hours worked by the employee per workweek (no records of the hours worked each workday or the total hours worked each workweek having been kept for said employee for said periods) to arrive at the back wage figure for the employee for said period; and plus (b) for each workweek, if any, during the period of the use of the 2-rate system for him in the second quarter of 1972, the following: for each hour worked in excess of 40 in a workweek at a rate equal to one-half times the regular

rate determined by dividing the fixed weekly sum paid by the number hours worked in that workweek (from the payroll records of the plumbing business) to arrive at the back wage figure for the employee for that workweek. The sum is the back wage figure for the employee for the entire period. Computing interest thereon should be done by computing at 6 percent per annum simple interest on the back wages figure for the employee from the midpoint of said period for the particular employee to date. Adding the back wage figure for the employee to the interest figure for the employee yields the total figure for the employee.

42. During the period from a point prior to March 1, 1970, to April 28, 1971, one of the hourly-rated employees employed in the hardware business was paid at an hourly rate less than $1.60 per hour, the applicable minimum wage. The employee was Duane Dykstra, and the hourly rates paid during said period, as confirmed by the payroll records of the hardware business, were as follows: $1.10 per hour through workweek ending May 5, 1970; $1.30 per hour during the period from workweek ending May 12, 1970 through workweek ending September 15, 1970; and $1.50 per hour during the period from workweek ending September 22, 1970 through workweek ending April 28, 1971.

43. Computing, from the payroll records of the hardware business, back wages for this employee should be done by computing back wages for each hour worked (during the period from workweek ending March 8, 1970 through workweek ending April 28, 1971) at the difference between $1.60 per hour and the hourly rate paid for such hours worked (as specified above). Computing interest thereon should be done by computing at 6 percent per annum simple interest on said back wage figure for the employee from the midpoint of said period

14. The payroll records of the plumbing business show for these employees the amount of the make-up accruals for the period from the time of the change through the end of the second quarter of 1972 and where there was a make-up accrual due to the employee, as in the case of Donald Hoorn and John Lundquist, it was paid by including it in column 7 for a workweek ending July 19, 1972, and paying it as a part of the regular weekly pay for that workweek.

to date. Adding said back wage figure to the interest figure yields the total figure for the employee.

44. At all times material hereto, the payroll records of the hardware business and the payroll records of the plumbing business both were maintained by Godwin's employee Mr. Vanderwal.

45. Payroll records of the two businesses generally show the following:

In columns appearing from left to right therein, the following [15] is shown separately each workweek with a separate line for each workweek [16]: first column shows "name" of the employee; the third column shows the workweek ending date under the "period ending"; the fourth column shows hours worked in that workweek; the fifth column shows "s" for a salaried employee and shows an hourly rate of pay (lower rate [17] in the case of an employee paid under the 2-rate system) for an hourly-rated employee; the sixth column shows the amount of the salary for a salaried employee and shows the amount computed by multiplying the hourly rate shown in the fifth column by the number of hours worked up to 40 hours shown in the fourth column for an hourly-rated employee; the seventh column shows the amount computed (but see paragraph 18(2) hereof) by multiplying the hourly rate shown in the fifth column by the number of hours worked in excess of 40 hours shown in the fourth column; and the ninth column shows the sum of the sixth column and the seventh column (plus any other sum shown in the eighth column, which contains payments not constituting compensation for hours worked); and the eighteenth column shows "net pay" paid after subtracting the payroll deductions shown in columns ten through seventeen.

Where this paragraph does not show in quotes how a column is labelled, the column is generally not labelled in the payroll records to show what the entries in the column are.[18]

46. Each line containing a date in the "period earning" column (column 3) represents a separate payroll check.

47. In addition, in or about a box near the top of the payroll record and labelled "rate" is the weekly salary for salaried employees and an hourly rate for hourly-rated employees, which is the higher rate in the case of an employee in the plumbing business paid under the 2-rate system; and adjacent to each entry is a workweek ending date generally for the first workweek to which the rate applies. Also shown near the top of the payroll record, are the social security number, the home address, and (for some employees) the occupation (in a box mislabelled "Dept or place of work") though generally for employees employed in Godwin Hardware's sales facility, place of work not occupation is shown (i.e., "store" is entered in said box).

48. For employees paid under the 2-rate system, the payroll records with only very rare errors show at the end of each quarter (until the second quarter of 1972 when the final conference of the plaintiff's second investigation occurred) the following: (1) for the quarter, the make-up accruals due to (generally shown in black pencil) or due from (generally shown in red pencil) the employee, and (2) the balance due to (generally shown in black pencil) or due from (generally shown in red pencil) the employee after adjustment by the amount of any unpaid make-up accruals due to or from the employee for any prior quarter(s). These

---

15. Quotation marks indicate the heading, if any, noted in the payroll records for the column.

16. A line covering not a regular weekly pay, such as one covering vacation pay (labelled "V") or a payment of a make-up accrual (generally labelled "B") or the like, are not covered by the paragraph even though the line for such payments would show the name of the employee and the date of the payment in the first and third columns respectively.

17. See footnote 3, *supra*.

18. A summary prepared at the end of the calendar year, however, generally labelled columns 6 through 17 containing for each employee separately the sum of all entries for the year in that column but including payments other than regular weekly payments, e.g., profit sharing and bonuses and payments of make-up accruals.

entries generally appear in or about column 1 (sometimes above the heading) generally on the lines preceding or following the group of lines showing weekly payments in a quarter. The entries are unlabelled.

49. During the period since at least March 1, 1970[19]: With rare exceptions[20], in the case of employees being paid under the 2-rate system the use of the notation "B"[21] (as opposed to "Bonus", "Xmas Bonus", "Xmas B", or "Xmas") in the payroll records was reserved for payments that consisted in whole or in part[22] of payments of make-up accruals due to employees under the 2-rate system. Conversely, with rare exceptions,[23] make-up payments to employees were labelled "B" in the payroll records and listed on a separate line therein and paid with a separate check until the May 11, 1972, final conference of the plaintiff's second investigation. Thereafter, payments[24] of make-up accruals due to employees were no longer labelled "B" and on the contrary were concealed. Some

amount, either the amount in column 6 or the amount in column 7, which would have otherwise been entered for some selected workweek[25] in the payroll records, was adjusted upward (or downward in the case of a payment due from an employee) by the amount of the payment of make-up accruals being made—before the amount was entered. Thus the one figure entered covered both the payment being made for make-up accruals and the payment being made for the type of payment normally entered in that column for such a workweek. Also, such a payment of make-up accruals was thus paid to the employee as a portion of the one payroll check covering the weekly pay for that workweek, because one line on the payroll records represents one payroll check. Also, the second quarter of 1972, which is the quarter in which the final conference of the plaintiff's second investigation occurred, was the last quarter in which the make-up accruals were shown in or about column 1 of the payroll records.

19. However, in at least 1966, when the first make-up accruals under the 2-rate system due to employees were computed and recorded in the payroll records, the *payment* of a make-up accrual was recorded in a separate, unlabelled *column* (column 8) on the same line as an ordinary weekly payment and was thus paid by means of the same check covering the ordinary weekly payment recorded on the same line, e.g., as a part of a regular weekly paycheck.

20. The following, occurring mainly in the summer of 1970, were the exceptions:

| Name | Date | Amount |
|---|---|---|
| Robert Decker | 7/10/70 | $350.00 |
| Ivan Lameyer | 4/28/71 | 55.00 |
| Dale Mensch | 8/19/70 | 210.00 |
| | 9/16/70 | 40.00 |
| | 9/23/70 | 50.00 |
| | 9/30/70 | 50.00 |
| | 10/ 7/70 | 50.00 |
| | 10/14/70 | 50.00 |
| | 10/21/70 | 50.00 |
| Donald Piebenga | 7/ 8/70 | 350.00 |
| Andrew Sikkema | 9/13/72 | 29.00 |

The payments to Donald Piebenga and Andrew Sikkema were long after termination of employment in the plumbing business and the payments to Dale Mensch were during a period of extended absence from work when he was receiving no other payments.

21. The payroll records do not contain an explanation of the meaning of this symbol.

22. The only exceptions occurred on January 11, 1971, when five employees each received a pay-

ment labelled "B" which covered make-up accruals and a true bonus as well, as follows:

| Name | Total Payment | Make-up Accrual Portion | Bonus Portion |
|---|---|---|---|
| John Haverhals | $154.12 | $124.12 | $ 30.00 |
| Dale Mensch | 221.50 | 101.50 | 120.00 |
| John Post | 48.00 | 30.00 | 18.00 |
| Donald Senneker | 98.00 | 68.00 | 30.00 |
| Donald Whitney | 104.13 | 89.88 | 14.25 |

23. The exceptions were:

| Name | Date | Amount | Where Shown In Payroll Records |
|---|---|---|---|
| Jeffrey Leep | 1/5/72 | $ 52.85 | Column 7 |
| Dale Mensch | 6/30/70 | 140.00 | Columns 6 and 7 |
| Jack Norman | 1/5/72 | 30.50 | Column 7 |
| Alan Simon | 12/22/71 | 52.00 | Column 6 |

All these payments were unlabelled in the payroll records; and although they are separately stated in the payroll records, they were paid with a check which also covered other payment(s), if any, for the workweek.

24. Except for employee Ivan Lameyer. See footnote 7, *supra*.

25. The workweek selected was usually workweek ending July 19, 1972, for the second quarter of 1972 and workweek ending August 16, 1972, for the period through workweek ending July 19, 1972 in the third quarter of 1972. Where there was no other payment in the selected workweek, the payment of make-up accruals was shown on a separate line (and thus paid with a separate check) but without a "B" label; this was the case with Dale Bishop, Cecil Brower, and Andrew Sikkema, for example, in workweek ending July 19, 1972.

Thus, generally speaking, some of the clearer indicia in the payroll records of an ongoing use of the 2-rate system disappear; but after workweek ending July 19, 1972, the hourly rate shown weekly in column 5 rises to the higher rate shown in the "rate" box near the top of the payroll records and generally the higher rate without change is *restated* in the "rate" box.

50. The workweek chosen for the concealment of the payment of make-up accruals was generally July 19, 1972, for the payment of the make-up accruals following the second quarter of 1972 and was generally August 16, 1972, for the payment of the make-up accruals in the third quarter of 1972 for the period through the end of the workweek ending July 19, 1972.

51. For employees paid on a salary basis, no record of hours worked was kept; and when some still employed were shifted to the 2-rate system in May of 1972, the continued use of the salary as the higher rate was not noted in the "rate" box near the top of the payroll records as had been the custom under the 2-rate system, or anywhere else on the payroll records.

52. In 1966, one of the plaintiff's compliance officers conducted an investigation of Godwin under the Act. Hereinafter this compliance officer is called the first compliance officer and the investigation he conducted in 1966 is called the first investigation. In 1972, another of the plaintiff's compliance officers conducted an investigation of Godwin under the Act. Hereinafter this compliance officer is called the second compliance officer and the investigation he conducted in 1972 is called the second investigation.

53. The first investigation was conducted during the period June 29, 1966, to August 11, 1966; and it inquired into whether Godwin had complied with the Act during the period June 29, 1964 to June 28, 1966.

54. At one point in this litigation, the defendants took the position that the first compliance officer had approved the 2-rate system during the course of the first investigation. However, the defendants' position is based not on statements by the compliance officer but rather on the fact that he failed to charge overtime violations as to hourly-rated employees employed in the plumbing business after September 7, 1965, when the 2-rate system was being used. Indeed, there was never any discussion of the 2-rate system or any similar system, whether in terms of actual use by Godwin or planned use by Godwin, or hypothetical use, or the legality of any such system, between the first compliance officer and Godwin or its representatives. So if Godwin did believe that the 2-rate system had been "approved", it was based on a mere assumption that the first compliance officer must have known about the use of the 2-rate system from his examination of some of Godwin's payroll records during the course of the first investigation and that he would have charged violations if the use of the 2-rate system violated the Act.

55. In actuality, there was never any realization by the first compliance officer at any time prior to the second investigation in 1972 that Godwin was using, or even planned to use, the 2-rate system or any similar system. During the first investigation, he examined the payroll records of the plumbing business for 1965 but they did not and do not contain any notations characteristic of the 2-rate system. Since he felt that there was no compelling reason to examine the payroll records of the plumbing business for 1966 because the 1965 records for it appeared to him to show facial compliance from September 7, 1965, through the end of 1965, he confined his examination of the payroll records for 1966 to an examination of the records for employees employed primarily in the hardware business and charged violations in 1966 only as to them. Moreover, although the payroll records of the plumbing business for 1966 show some entries now known to be characteristic of the 2-rate system, not even the defendants know whether the entries were all present on the records in the summer of 1966 during the first investigation and most

of the entries, including all those showing make-up accruals and the paying of make-up accruals, are unlabelled and may not even be in the same handwriting as the weekly entries; and since at that time make-up accruals were paid annually and not quarterly, at most one payment (at the beginning of 1966 for September 7, 1965, through the end of 1965) appears for any given employee employed in the plumbing business and quarterly accruals for 1966 may not have been computed (and thus entered on the records) each quarter during 1966. Thus it appears that even if the first compliance officer had conducted an examination of the payroll records of the plumbing business for 1966 during the first investigation in the summer of 1966, they standing alone, would have been a very uncertain guide to the discovery of the fact that the 2-rate system was being used, particularly since any question then by the first compliance officer as to the nature of what was then the only payment of a set of payments of make-up accruals (at most one per employee in early 1966) may have been met with the same misrepresentation the second compliance officer received when he asked the same question during the second investigation in 1972, i.e., the misrepresentation that any such payment was a "discretionary bonus." Without some guidance from someone, which the first compliance officer received from no one, it would have been extremely difficult to unravel the method of calculating make-up accruals or unravel the payment of make-up accruals from the payroll records in existence at the time of the first investigation. If Godwin assumed the first compliance officer knew about the 2-rate system from any examination of the payroll records of the plumbing business during the first investigation, Godwin was clearly unjustified; and if Godwin assumed that the compliance officer had "approved" the 2-rate system from his mere silence or failure to charge violations in 1966 for employees employed in the plumbing business, it was even more clearly unjustified.

56. The first compliance officer did discover in the first investigation that Godwin had reduced the hourly rates of pay for hourly-rated employees employed in the plumbing business when on September 8, 1965, the payroll records of the plumbing business began to show facial compliance with the overtime pay requirements of the Act. At a conference on July 6, 1966, with Mr. Brummel and Mr. Vanderwal, who was Godwin's bookkeeper-office manager, the first compliance officer told Mr. Brummel and Mr. Vanderwal that the Act itself did not prohibit an employer and an employee from agreeing to a bona fide reduction in the hourly rate of pay *provided* the new hourly rate was intended to and did actually control the total compensation received by an employee and was not less than the minimum wage applicable. The 2-rate system violated these limitations.

57. During the first investigation, the first compliance officer discovered that at least one employee employed as a clerk at the time of the investigation was being paid by Godwin on a salary basis, i.e., by payment of a fixed weekly sum for all hours worked in the workweek, regardless of the number of hours worked in the particular workweek, as the employee's total compensation for the workweek in excess of 40 in the workweek. The first compliance officer determined that the employee did work in excess of 40 hours per workweek and that no records of the number of hours worked by the employee was kept; consequently, he charged overtime pay and recordkeeping violations of the Act with respect to the employee and made a computation of back wages due the employee. At the final conference of July 6, 1966, the first compliance officer informed Mr. Brummel and Mr. Vanderwal of the basis for said charges and the back wages computed; and in response thereto, Mr. Brummel agreed to correct these violations and to pay the back wages the first compliance officer had computed to be due to the employee under the Act.

58. During the first investigation, the first compliance officer discovered that at least one employee employed as a clerk at the time of the investigation had been paid on an hourly basis with an hourly rate

lower than the applicable minimum wage from at least workweek ending July 1, 1964, through workweek ending June 16, 1965. The first compliance officer charged minimum wage violations of the Act with respect to the employee and computed back wages due the employee under the minimum wage provisions of the Act (as well as charging overtime pay violations of the Act with respect to the same employee and computing back wages due the employee under the overtime pay provisions of the Act). At the final conference on July 6, 1966, the first compliance officer informed Mr. Brummel and Mr. Vanderwal of the basis for said charges and the back wages computed; and in response thereto, Mr. Brummel agreed to correct these violations and pay the back wages the first compliance officer had computed to be due to the employee.

59. In the first investigation, the first compliance officer computed back wages due for 22 employees paid in violation of the minimum wage provisions, the overtime provisions, or both, for the period from June 29, 1965, to June 28, 1966. The back wages included $162.88 in unpaid minimum wages due one employee and $17,837.02 in unpaid overtime compensation due 22 employees for a total of $17,999.90. At the final conference, on July 6, 1966, the first compliance officer explained the basis of the violations being charged and requested the payment of the back wages the first compliance officer had computed (as shown on a back wage summary furnished to Godwin prior to the final conference) after explaining the basis of his computations. At the final conference, Mr. Brummel promised to comply fully with the Act in the future, and he also agreed to pay the back wages due as computed by the first compliance officer.

60. At the final conference on July 6, 1966, the first compliance officer gave Mr. Brummel and Mr. Vanderwal a copy of the then current version of each of the following:

a) the act

b) the recordkeeping regulations, constituting a reprint of Part 516A of Title 29 of the Code of Federal Regulations

c) a pamphlet containing an informal explanation of the recordkeeping regulations

d) a pamphlet, called "Handy Reference Guide" containing an informal explanation of the principal provisions of the entire Act.

61. At the final conference, Mr. Brummel, promised that Godwin would comply fully with the Act.

62. After the conclusion of the first investigation, Brummel told one of his employees employed as a plumber in the plumbing business that although the first compliance officer had told Mr. Brummel that the Act required the payment of one and one-half times the regular rate for hours worked in excess of 40 hours in a workweek, he (Brummel) was not going to do any such thing and he (Brummel) was going to make it appear that he (Brummel) was paying such pay by use of the 2-rate system.

63. The second investigation was conducted during the period April 11, 1972, to June 27, 1972; and it inquired into whether Godwin had complied with the Act, principally during the period January 1, 1970, to the start of the investigation.

64. During the second investigation, the second compliance officer asked Godwin to explain the payments shown in the payroll records of the plumbing business with the label "B"; and he was told by Mr. Vanderwal, who was Godwin's office manager, that they were "discretionary bonuses." Later, when the second compliance officer had completed his interviewing of his sample of Godwin's employees, the compliance officer in a meeting with both Mr. Brummel and Mr. Vanderwal charged that the hourly-rated employees employed in the plumbing business had been and were being paid under the 2-rate system, the principal elements of which the second compliance officer outlined, and that the payments so identified as "B" were make-up payments under the 2-rate system. Mr. Brummel

then acknowledged use of the 2-rate system.

65. The second compliance officer concluded that the defendants had violated the provisions of the Act; and on or about May 11, 1972, he conducted a final conference with Godwin at which Mr. Brummel and Mr. Vanderwal were present on behalf of Godwin. At this conference he charged that the violations found in these findings of fact and conclusions of law for the period investigated had occurred and requested that Godwin agree to comply with the Act in the future. Mr. Brummel, on behalf of all the defendants, agreed to comply with the Act except with respect to the 2-rate system. Mr. Brummel would not agree to commit the defendants to abandon the 2-rate system. The Wage and Hour Division was not notified of any change in this position.

66. At all times material hereto, the defendants have been fully aware of the pay policies which were prevailing in the two businesses, and indeed, all such policies were set by, and even much of the implementation, especially as to the 2-rate system, was done by, Mr. Brummel himself— both as sole proprietor and as president of the corporate defendants after their respective incorporations—though see footnote 4, *supra*.

67. At all times material hereto, the defendants have been fully aware of the Act, its applicability to them, and at least the general nature of its minimum wage, overtime pay, and recordkeeping requirements.

68. Mr. Brummel's letter first promulgating the 2-rate system in 1965 stated:

> The Wage and Hour Law demands that all employers pay time and one half for all hours over forty (40) hours in one week. To comply with this request and eliminate our being subject to penalty of law, we are making the following revisions to our payroll rates   .   .   .

During the first investigation, in 1966, he was given a copy of the Act and the explanatory literature listed in paragraph 60 hereof and was given an explanation of the violations uncovered and the computation

of the back wages; and he agreed to comply with the Act and pay the back wages due under the Act as computed by the first compliance officer.

69. Indeed, at all times material hereto, the defendants realized or had every reason to realize that their pay practices did not amount to the payment of wages in compliance with the Act and that their recordkeeping practices were not in compliance with the Act.

70. As to the 2-rate system: When the 2-rate system was initiated in 1965, Brummel's letter promulgating it stated that:

> Any differences caused by the above changes will be *corrected* at the end of the year. This means that you *will receive the same earnings* as before except that the distribution will be handled differently. (emphasis added).

After the first investigation, Brummel declared to one of his employees his intention of defying the requirements of the Act as he understood them from the first compliance officer and his intention of using the 2-rate system to make it appear that he was complying with the Act.

71. At the end of 1970, when five employees (who were newly hired in the summer of 1970 as hourly-rated employees in the plumbing business but not paid under the 2-rate system until the beginning of 1971) were notified that they were being placed under the 2-rate system, the defendants told them that the payment of overtime pay to them in 1970 was "a mistake" and that "Godwin did not pay overtime." In 1970, when the profit-sharing plan (beginning in 1971 for employees in the plumbing business) was announced, Brummel's letter announcing the plan to affected employees stated that the anticipated profit-sharing payments were expected to be such that they "would be equal or more than what time-and-a-half *would* amount to" (emphasis added) thus reflecting an awareness that overtime compensation was not being paid and was not going to be paid to such employees.

72. In some cases, the payroll records identify the higher rate as being the "true"

rate and identify some employees identified above as temporary exceptions to the use of the 2-rate system as the recipients of "OT" only during the period of the exception and not during periods when they were on the 2-rate system.

73. On May 11, 1972, at the final conference of the second investigation, the defendants were told the 2-rate system violated the overtime pay provisions of the Act. Nonetheless, the defendants refused to give assurances of future compliance; and on the contrary, not only was the use of the 2-rate system continued for a time but also employees paid on a salary basis immediately prior to said investigation were placed on the 2-rate system, with their former salaries (rather than a separate hourly rate) serving as their higher rate. In addition, the defendants altered their recordkeeping practices to conceal their use of the 2-rate system even after the final conference.

74. Indeed, the inherent characteristics of the 2-rate system, and the less than straight-forward recordkeeping practices that accompanied it, evince more a scheme to evade the Act than a willingness to comply with legal obligations and the obvious statutory purposes for imposing those obligations.

75. As to the payment of employees on a salary basis and the payment of wages at a sub-minimum rate: At the time of the first investigation, in 1966, Brummel and Mr. Vanderwal, Godwin's office manager-bookkeeper were told that payment of a salary without also paying the extra compensation required by the overtime pay provisions of the Act for hours worked in excess of 40 hours in a workweek and the payment of wages at sub-minimum rates were violations of the Act. Brummel gave assurances at the final conference on July 6, 1966, of full compliance with the Act, including correction of then-existing violations of those types and payment of the back wages computed to be due under the Act as a result thereof by the first compliance officer during the first investigation, as well as payment of other back wages computed to be due under the Act.

*Conclusions of Law*

76. This court has jurisdiction of this action and the parties thereto under section 17 of the Act.

77. At all times material hereto, the hardware business, the plumbing business, and the two joined together have concededly each constituted an "enterprise" within the meaning of section 3(r) of the Act.

78. At all times material hereto, the hardware business enterprise, the plumbing business enterprise, and the enterprise consisting of the two joined together have concededly each constituted an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of section 3(s) of the Act; and at all times material hereto, the enterprise consisting of the two joined together has constituted an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of section 3(s) of the Act as it existed prior to the Fair Labor Standards Amendments of 1966.

79. Coverage is thus conceded for all times material hereto, and the minimum wage provisions of section 6(a)(1) of the Act, the overtime pay provisions of section 7(a)(1) of the Act, and the recordkeeping provisions of section 11(c) of the Act (and the regulations duly issued pursuant to the authority granted in the Act and published in the Federal Register and known as Part 516 of Title 29 of the Code of Federal Regulations) have at all times material hereto been applicable to the employees of the defendant(s) referred to herein.

80. Under section 7 of the Act, the regular rate of an employee who was being paid under the 2-rate system was the higher rate: in the case of employees employed in the plumbing business, the regular rate was the higher *hourly* rate; and in the case of the employees employed in the hardware business, the regular rate was the salary divided by the number of hours worked by the employee in the workweek concerned. *Brennan v. W. G. Faglie* 77 CCH Labor Cases ¶ 33,268 (E.D.Tex., 1975); *Wirtz v. Brady*, 267 F.Supp. 168 (W.D.Pa., 1967); *McComb v. E. H. Dobson*, 77 F.Supp.

1, 14 CCH Labor Cases ¶ 64,500 (W.D.Pa., 1948).

■ 81. The higher rate, not the lower rate, actually controlled the compensation "ultimately receive(d)" by the employee for each hour worked, as agreed in advance of the performance of the work; the formulation specifying that some other rate should constitute the regular rate for purposes of section 7 of the Act cannot be effective, *Walling v. Harnischfeger Corp.*, 325 U.S. 427, 429, 65 S.Ct. 1246, 89 L.Ed. 1711, 9 CCH Labor Cases ¶ 51,204, p. 51,595 (1945); *Walling v. Youngerman—Reynolds Hardwood Co.*, 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705, 9 CCH Labor Cases ¶ 51,203 (1945), for the regular rate

. . . is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary "regular rate" . . . *Walling v. Youngerman—Reynolds Hardwood Co.*, 325 U.S. 419, 424, 65 S.Ct. 1242, 1245, 89 L.Ed. 1705, 9 CCH Labor Cases ¶ 51,203, p. 51,-589 (1945).

As the Supreme Court has stated,

(c)ontracts for pay take many forms. The rate of pay may be by the hour, by piecework, by the week, month or year, and with or without a guarantee that earnings for a period of time shall be at least a stated sum.

\*　　\*　　\*　　\*　　\*　　\*

From all such wages the regular hourly rate must be extracted.

*Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460, 68 S.Ct. 1186, 1194, 92 L.Ed. 1502, 15 CCH Labor Cases ¶ 64,556, p. 73,665 (1948). *Walling v. Harnischfeger Corp., supra.* Here that actual fact is the higher rate not the lower rate.

■ 82. This is in accord with what the Act now expressly provides. Section 7(e) of the Act defines the term "regular rate" as follows:

As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include . . . .

The section goes on to list several exceptions [26]; but none applies to any portion of compensation covered by multiplying the higher rate by the number of hours worked. These exceptions should be "narrowly construed" and limited those "plainly and unmistakably within their terms and spirit" as in the case of exemptions contained in the Act, *Arnold v. Ben Kanowsky*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393, 39 CCH Labor Cases ¶ 66,237, p. 69,425 (1960) for the "(e)xemptions (are) made in such detail (as to) preclude their enlargement by implication." *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, 8 CCH Labor Cases ¶ 51,181, p. 1253 (1944).

■ 83. Weekly payments in column 7 of the payroll records (the purported overtime earnings column) do not, even to the extent they exceed the lower rate times the

---

**26.** The exceptions pertinent to the claims advanced here are:

(1) sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency;

\*　　\*　　\*　　\*　　\*　　\*

(3) sums paid in recognition of services performed during a given period if either, (a) both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near

the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly; or . . . .

\*　　\*　　\*　　\*　　\*

(5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) of this section or . . . .

\*　　\*　　\*　　\*　　\*

number of hours worked in excess of 40 in the workweek, represent "extra compensation," within the meaning of sections 7(e)(5), (6), or (7) for hours worked in excess of 40 in a workweek. All of each of the weekly payments, of which they were a part, were merely payments on account under the 2-rate system because ultimately they were effectively revised upward or downward as needed to bring total hourly compensation paid for the hours worked in the workweek into line with the higher rate computation, i.e., the higher rate times the number of hours worked.

■ 84. In addition, the setting of the amounts of the payments shown in column 7 were sometimes computed on an ad hoc basis in contemplation of the ultimate revision, resulting in the employee receiving even less than one and one-half times the *lower* rate for hours worked in excess of 40 hours in a workweek; thus the amounts, at least in such workweeks for the employees covered by this practice, were not extra compensation at a "premium rate", i.e., an identifiable premium *hourly* rate, as required by sections 7(e)(5), (6), and (7) of the Act for exclusion of a payment from regular rate computations.

85. The payments referred to in paragraphs 84 and 85 hereof were not paid "for certain hours . . . because such hours are hours worked in excess of . . . the (40 hour) workweek applicable," within the meaning of section 7(e)(5) of the Act, but rather were paid to further an ultimately ineffectual and unlawful scheme "to evade (the overtime requirements of) the Act" (*Brennan v. W. D. Faglie, Jr., Inc.,* 77 CCH Labor Cases ¶ 33,268, p. 47,052, paragraph 11 (E.D.Tex., 1975)) by merely simulating compliance with the overtime pay provisions of the Act.

86. Nor are the payments of make-up accruals under the 2-rate system excludable from regular rate computation pursuant to sections 7(e)(1) or (3) of the Act, as claimed by the defendants.

■ 87. Payments of make-up accruals under the 2-rate system were not gifts nor were they payments in the nature of gifts on special occasions, but rather they were regular periodic payments covering compensation due for and measured by the number of hours worked by the employee. Both the fact that make-up accruals would be paid and the formula and rates for computing the amount thereof were fixed in advance of the employee's performance of the work by Godwin's promise to pay the make-up accruals as part of what the employee would receive as compensation for his labors. Moreover, the amount of the payments was totally dependent on hours worked, i.e., the higher rate times the hours worked—less payments on account (also largely measured by hours worked) already received for those hours worked.

■ 88. Payments promised and regularly paid by an employer to an employee, like the payments of make-up accruals due to an employee under the 2-rate system here, cannot be said to have or acquire a discretionary character grounded simply on the fact that the employer retains, expressly or through the absence of a requirement of law to the contrary, the right to stop such payments for work performed after the employee has been given notice that the employer will no longer follow the practice of making such payments. It would be merely an ineffectual play on words to call such a payment discretionary and justify the appellation with the fact that the employer might arbitrarily, and in violation of his agreement with the employee, fail to pay for work performed while the promise to pay such payments for such work was still outstanding.

■ 89. Use of the 2-rate system for an employee resulted in the employee receiving only straight-time compensation for each hour worked, including those hours in excess of 40 hours in a workweek, in violation of section 7 of the Act. By thus denying the employee compensation for his hours worked in excess of 40 hours in a workweek at a rate which was not less than one and one-half times his regular rate, both the

express terms of the Act and the statutory purposes were violated; the employee did not receive the intended extra compensation for long hours and the employer did not have the intended incentive of extra costs to reduce the hours worked by the employee. *Overnight Motor Co. v. Missel,* 316 U.S. 572, 577–578, 62 S.Ct. 1216, 86 L.Ed. 1682, 5 CCH Labor Cases ¶ 51,145, p. 51,285 (1941); *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29, 9 CCH Labor Cases ¶ 51,183 (1944). Moreover, the use of such a system gives an employer an unfair advantage vis-a-vis his competitors.

90. Additionally, the Secretary has long been aware of such systems and has addressed the question of the legality of them in an interpretative statement on the overtime provisions of the Act contained in 29 CFR § 778,500(a) reading as follows:

> Since the term "regular rate" is defined to include all remuneration for employment . . . the overtime provisions of the Act cannot be avoided by setting an artificially low hourly rate upon which overtime pay is to be based and making up the additional compensation due to employees by other means. The established hourly rate is the "regular rate" to an employee only if the hourly earnings are the sole source of his compensation. Payment for overtime on the basis of an artificial "regular" rate will not result in compliance with the overtime provisions of the Act.

Furthermore, 29 CFR § 778,502(a) reads as follows:

> The terms [bonus] is improperly applied if it is used to designate a portion of regular wages which the employee is entitled to receive under his regular wage contract.

Both such sections have been extant at all times material to this action.

91. It is well settled that the judiciary is to accord "great deference to the interpretation given the statute by the officers or agency charged with its administration", *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), reh. denied 380 U.S. 989, and is to follow such an interpretation "unless there are compelling indications that it is wrong" *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

92. The conclusions of law stated in paragraphs 81 through 83 and 85 through 92 hereof apply also to the 2-rate system as used for employees of Godwin Hardware formerly paid on a salary basis.

93. Compensating an employee on a salary basis, without extra compensation at the premium rate specified by section 7 of the Act for hours worked in excess of 40 in a workweek, violates section 7 of the Act. *Missel v. Overnight Transportation Co.,* 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, 5 CCH Labor Cases ¶ 51,145 (1942).

94. Payments, such as the profit-sharing payments, which are over and above the higher rate times hours worked (inclusive of payments of make-up accruals), do not fail on this record to qualify for exclusion under section 7(e) of the Act from regular rate computations; but they do not qualify under section 7(h) of the Act as "extra compensation . . . creditable toward overtime compensation payable" under section 7 of the Act.

95. The defendants have violated the provisions of section 11(c) of the Act and regulations duly issued pursuant to authority granted in section 11(c) of the Act and published in the Federal Register and known as Regulations Part 516 of Title 29 of the Code of Federal Regulations, by failing to show all required information, by failing to label information (and do so adequately, including an accurate definition of codes or symbols used) to help avoid the possibility of confusion and avoid misrepresentations such as occurred in this case as to the significance of entries, and by combin-

ing disparate information into single entries in a false or misleading fashion and otherwise falsifying their payroll records. Indeed, the inherent characteristics of the 2-rate system were such that a full written statement of the 2-rate system and how its operation was reflected in the payroll records should have been an integral part of the payroll records themselves.

■ 96. At all times material hereto, Brummel was an employer of the employees employed by Godwin Hardware and Godwin Plumbing and is jointly and severally liable with them.

97. The Act proscribes violations by any employer. The Act's definition of the term "employer", which is the "broadest . . . that has ever been included in any one act", *U. S. v. Rosenwasser,* 323 U.S. 360, 363, n. 3, 65 S.Ct. 295, 296, n. 3, 89 L.Ed. 301, 9 CCH Labor Cases ¶ 51,190, p. 51,493, n. 3 (1945), specifically states that for purposes of the Act the term

> includes any person acting directly or indirectly in the interest of an employer in relation to an employee (section 3(d) of the Act)

*Falk v. Brennan,* 414 U.S. 190, 94 S.Ct. 427, 38 L.Ed.2d 406, 72 CCH Labor Cases ¶ 32,-991, p. 46,253 (1973).

■ 98. A managing agent, such as a corporate officer, who actively participates in the management of a business regarding the employment practices prevailing in the business is an employer within the meaning of section 3(d) of the Act, and he is liable along with the corporation or other business entity to be restrained from further violations and to be jointly and severally restrained from failing to make restitution of back wages due under the Act. *Shultz v. Mack Farland & Sons,* 413 F.2d 1296, 1300, 60 CCH Labor Cases ¶ 32,200, p. 43,857 (C.A.5, 1969); *Brennan v. James B. Jeffries, et al.,* 398 F.Supp. 471, 72 CCH Labor Cases ¶ 32,956 (D.Arizona, 1973), affirmed *per cu-*

*riam,* 77 CCH Labor Cases ¶ 33,305 (C.A.9, 1975); *Usery v. South Glen Falls Lumber Co.,* 78 CCH Labor Cases ¶ 33,362 (N.Y., 1976); *Hodgson v. Centralized Services, Inc., et al.,* 325 F.Supp. 138, 64 CCH Labor Cases ¶ 32,452 (W.D.No.Car., 1971) reversed on other grounds 457 F.2d 824, 67 CCH Labor Cases ¶ 32,647 (C.A.4, 1972); *Shultz v. Chalk-Fitzgerald Construction Co.,* 309 F.Supp. 1255, 1257, 62 CCH Labor Cases ¶ 32,308, p. 44,160 (D.Mass., 1970). See also *Wirtz v. Pure Ice Co.,* 322 F.2d 259, 48 CCH Labor Cases ¶ 31,483 (C.A.8, 1963).

99. Godwin Plumbing and Brummel have violated the provisions of sections 7 and 15(a)(2) of the Act by paying compensation for hours worked in excess of 40 in a workweek at only the employee's regular rate and not at one and one-half times the employee's regular rate to each of their employees paid under the 2-rate system, while so paid. Said defendants are jointly and severally indebted, to each of said employees for said period, for an additional one-half times the employee's regular rate for each such hour (computed as described in paragraph 38 hereof) and for interest thereon (computed as described in paragraph 38 hereof).

100. Godwin Hardware and Brummel have violated the provisions of sections 7 and 15(a)(2) of the Act by paying compensation for hours worked in excess of 40 hours in a workweek at only the employee's regular rate and not at one and one-half times the employee's regular rate to each of the employees referred to in paragraphs 39 and 40 hereof for the periods referred to in said paragraphs. Said defendants are jointly and severally indebted, to each of said employees for said period, for an additional one-half times the employee's regular rate for each such hour (computed as described in paragraph 41 hereof) and for interest thereon (computed as described in paragraph 41 hereof).

101. Godwin Hardware and Brummel have violated the provisions of sections 6

and 15(a)(2) of the Act by paying compensation for all hours worked at a rate less than $1.60 per hour to the employee referred to in paragraph 42 hereof for the periods referred to in said paragraph. Said defendants are jointly and severally indebted, to said employee for said period, for the difference between $1.60 per hour and the rate so paid for each such hour (computed as described in paragraph 43 hereof) and for interest thereon (computed as described in paragraph 43 hereof).

■ 102. The acts and omissions constituting the violations of sections 6 and 7 of the Act since March 1, 1970, were willful. They were committed by the defendants knowingly, as opposed to merely negligently or accidentally, and were committed with at least a general awareness that the requirements of the law were in the picture; and nothing more is required to establish that violations were willful in the civil sense in which that term is used in section 6 of the Portal to Portal Act[27] making the applicable statute of limitations three, not two, years in the case of willful violations. *Dunlop v. Zager,* 529 F.2d 524, 78 CCH Labor Cases ¶ 33,328 (C.A. 6, 1975), cert. den., 429 U.S. 821, 97 S.Ct. 71, 50 L.Ed.2d 83, CCH Labor Cases ¶ (3)6d (1976), affirming 76 CCH Labor Cases ¶ 33,-238 (M.D.Tenn., 1975). *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 66 CCH Labor Cases ¶ 32,588 (C.A. 5, 1972), petition for reh'g denied, 458 F.2d 1142, 68 CCH Labor Cases ¶ 32,681, cert. den., 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1971); *Brennan v. Air Terminal Parking of Columbia,* 498 F.2d 1397, 74 CCH Labor Cases ¶ 33,089 (C.A. 4, 1975) affirming 72 CCH Labor Cases ¶ 32,979 (D.S.C., 1973, not offi-cially reported); *Brennan v. J. M. Fields,* 488 F.2d 443, 72 CCH Labor Cases ¶ 32,993 (C.A. 5, 1973); *Brennan v. Heard,* 491 F.2d 1, 73 CCH Labor Cases ¶ 33,038 (C.A. 5, 1974); *Conklin v. Hofgesang Sand Co., Inc.,* 407 F.Supp. 1090, 78 CCH Labor Cases ¶ 33,389 (W.D.Ky., 1975); *Dunlop v. Rhode Island,* 398 F.Supp. 1269, 77 CCH Labor Cases ¶ 33,290 (D. of R.I., 1975) reversed on grounds of State immunity under the Tenth Amendment to the U.S. Constitution, CCH Labor Cases ¶ ___ (C.A. 1, 1976); *Brennan v. Authorized Appliance Servicecenter, Inc.,* 73 CCH Labor Cases ¶ 33,050 (M.D.N.C., 1974).

■ 103. Not even a finding of good faith, if one were justified, would call for a different conclusion, *Coleman v. Jiffy June Farms, Inc., supra, Conklin v. Hofgesang Sand Co., Inc., supra, Dunlop v. Rhode Island, supra,* for good faith is the test under section 11 of the Portal to Portal Act as to awardability of liquidated damages, as previously stated by this court in this case, *Usery v. Godwin Hardware, Inc., et al.,* 79 CCH Labor Cases ¶ 33,414 (W.D.Mich., 1976), but not under section 6 of the Portal to Portal Act as to the recovery of the wrongfully withheld back wages themselves, not even for the third year prior to the filing of suit.

[17, 18] 104. The defendants pleaded an affirmative defense claiming that the plaintiff is estopped from bringing this action and/or from recovering back wages due, because of alleged oral representations approving the 2-rate system made to Brummel by the first compliance officer during the first investigation. This defense, even if it were factually true, is insufficient in law because section 10[28] of the Portal to

---

**27.** Section 6 of that Act reads as follows: Any action commenced on or after the date of the enactment of this Act to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

  (a) if the cause of action accrues on or after the date of the enactment of this Act—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

**28.** Section 10 of the Act reads as follows:
  (a) In any action or proceeding based on any act or omission on or after the date of the enactment of this Act, no employer shall

Portal Act provides the exclusive estoppel defense to actions under the Fair Labor Standards Act by giving protection against a recovery of back wages in certain limited circumstances. Section 10 requires that a defendant plead and prove that it relied on an opinion in writing from the Administrator of the Wage-Hour Division. The alleged representations claimed by the defendants in this case were oral and were not from the Administrator, thus disqualifying them as a basis for an estoppel defense for at least these two independent reasons. See the opinion of this Court in this case striking the estoppel defense, *Usery v. Godwin Hardware, Inc., et al.,* 79 CCH Labor Cases ¶ 33,414, and *Hodgson v. Square D. Company,* 459 F.2d 805, 68 CCH Labor Cases ¶ 32,677 (C.A. 6, 1972).

105. The plaintiff is entitled to an injunction restraining the defendants from further violations of sections 6 and 15(a)(2) and sections 7 and 15(a)(2) and sections 11(c) and 15(a)(5) of the Act and including the restraint of the continued withholding of back wages due, with interest thereon, and costs.

106. An injunction requiring future compliance "does not subject an employer to any penalty for his past violations of the law. It merely says: In the future do what the law requires you to do"; and where there have been repeated violations, it is entirely appropriate that "he should bear his own responsibility for the future." *Goldberg v. Cockrell,* 303 F.2d 811, 814, 45 CCH Labor Cases ¶ 31,288, p. 41,323 (C.A. 5, 1962); *Mitchell v. Southwest Eng.,* 271 F.2d

427, 38 CCH Labor Cases ¶ 65,912 (C.A. 8, 1959); *Hodgson v. Ricky Fashions, Inc.,* 434 F.2d 1261, 1263-4, 64 CCH Labor Cases ¶ 32,409 (C.A. 5, 1970); *Brennan v. Peterson,* 77 CCH Labor Cases ¶ 33,250 (C.A. 10, 1975). Thus, the Supreme Court, in *Mitchell v. Lublin, McGaughy, and Associates,* 358 U.S. 207, 214, 79 S.Ct. 260, 265, 3 L.Ed.2d 243, 36 CCH Labor Cases ¶ 65,149, p. 65,516 (1959), "fail[ed] to see what undue burden will be placed on respondent [employer] by the issuance of an injunction".

107. The retention of sums withheld in violation of the Act represents "a continuing offense against the public interest," which can be corrected only through "enforced payment, which must be made" as "part of a reasonable and effective means which Congress, after trial and error, found it necessary to adopt to bring about general compliance . . ." *Wirtz v. Jones,* 340 F.2d 901, 51 CCH Labor Cases ¶ 31,665 (5 Cir. 1965); *Wirtz v. Malthor,* 391 F.2d 901, 57 CCH Labor Cases ¶ 32,022 (C.A. 9, 1968); *Shultz v. Mack Farland and Sons Roofing Company,* 413 F.2d 1296, 60 CCH Labor Cases ¶ 32,200 (C.A. 5, 1969); *Wirtz v. Harper Buffing Machine Co.,* 280 F.Supp. 376, 57 CCH Labor Cases ¶ 32,005 (D.Conn., 1968), affirmed *per curiam,* 60 CCH Labor Cases ¶ 32,181 (2d Cir., 1968, not otherwise reported), and *Hodgson v. Taylor,* 439 F.2d 288, 65 CCH Labor Cases ¶ 32,473 (C.A. 8, 1971).

■ 108. The parties hereto have stipulated that no liquidated damages are being sought; accordingly none are granted.

---

be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers

to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

(b) The agency referred to in subsection (a) shall be—

(1) in the case of the Fair Labor Standards Act of 1938, as amended—the [Secretary of Labor].

However, pre-judgment interest on the back wages should be awarded. The pertinent equitable considerations have been clearly stated by the Sixth Circuit in *McClanahan v. Mathews,* 440 F.2d 320, 65 CCH Labor Cases ¶ 32,479 (6 Cir. 1971), as follows:

There are compelling reasons why pre-judgment interest should be recoverable where, in its discretion, the district court has awarded less than the maximum amount of liquidated damages [in addition to back wages]. It is well settled that "one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation should fairly be compensated for the loss thereby sustained." *Rodgers v. United States,* [332 U.S. 371, 373, 68 S.Ct. 5, 92 L.Ed. 3 (1947)]. In the closely analogous situation of back pay awards in labor cases, this Court and * * * other courts of appeals have applied this principle so as to allow interest from the time the claims accrued. See *Philip Carey Mfg. Co., Miami Cabinet Div. v. NLRB,* 331 F.2d 720, * * * [which] is particularly relevant here:

"It is recognized under our legal system that wage earners are heavily dependent upon wages, which more often than not constitute the sole resource to purchase the necessities of life from day to day. [* * *] Many wage-earners who are deprived of their wages doubtlessly find it necessary to borrow money to sustain themselves and their families, paying rates of interest at six percent or higher." 331 F.2d at 730.

While wage earners who are being unlawfully deprived of a minimum wage are borrowing money to sustain themselves, and paying interest, the non-complying employer, however innocent, is benefitting from his violations, since he has the use of his employee's money. Unless the delinquent employer is required to restore his employee to the position he would have been in had there been no violations, via an award of liquidated damages or interest on the back wage award, the employer will thereby have been unjustly enriched by his own violation at his employee's expense. Surely Congress did not intend this result, and we will not impose it. [440 F.2d at 324–26].

Accord: *Hodgson v. American Can Co.,* 440 F.2d 916, 65 CCH Labor Cases ¶ 32,475 (C.A. 8, 1971); *Brennan v. Maxey's Yamaha, Inc.,* 513 F.2d 179, 76 CCH Labor Cases ¶ 33,224 (C.A. 8, 1975); *Brennan v. City Stores, Inc.,* 479 F.2d 235, 71 CCH Labor Cases ¶ 32,910 (C.A. 5, 1973); *Hodgson v. Wheaton Glass Co.,* 446 F.2d 527, 65 CCH Labor Cases ¶ 32,537 (C.A. 3, 1971); and *Hodgson v. Daisy Manufacturing Co.,* 445 F.2d 823, 65 CCH Labor Cases ¶ 32,528 (C.A. 8, 1971); *Hodgson v. Corning Glass Works,* 474 F.2d 226, 70 CCH Labor Cases ¶ 32,842 (C.A. 2, 1973).

■ 109. The plaintiff is entitled to have included in the back wage payment order a provision requiring payment to the plaintiff for distribution of the checks, or the proceeds thereof, to the employees concerned, or to their estates if that be necessary, and requiring that any money not so paid within a period of one year from the date of the plaintiff's receipt of the last such money due under the order, because of inability to locate the proper person or because of their refusal to accept it, shall be deposited with the Clerk of this Court who shall be directed to forthwith deposit such money with the Treasurer of the United States pursuant to 28 U.S.C. § 2041. It is settled that, in order to effectuate the purposes of the Act, back pay which is refused by the underpaid employees may not be returned to the employer but must be retained in the Treasury, subject to the employees' call. *Burk Builders v. Wirtz,* 355 F.2d 451, 53 CCH Labor Cases ¶ 31,755 (C.A. 5, 1966); *Hodgson v. Quezada,* 498 F.2d 5, 74 CCH Labor Cases ¶ 33,090 (C.A. 9, 1974); *Hodgson v. Wheaton Glass Co.,* 446 F.2d

527, 535, 65 CCH Labor Cases ¶ 32,537 (C.A. 3, 1971).

■ 110. As the Secretary has expressly advised employers in 29 CFR 531.35, "[t]he wage obligations of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer * * the whole or part of the wage delivered to the employee." See *Mayhue's Super Liquor Stores v. Hodgson,* 464 F.2d 1196, 1199, 69 CCH Labor Cases ¶ 32,738 (C.A. 5, 1972); *Dunlop v. Midget,* 78 CCH Labor Cases ¶ 33,384 (N.D.N.C., 1976). This is in accord with settled law that the protection afforded by the Act cannot be waived. *Brooklyn Bank v. O'Neil,* 324 U.S. 697, 706–07, 65 S.Ct. 895, 89 L.Ed. 1296, 9 CCH Labor Cases ¶ 51,197 (1945); *Wirtz v. Turner,* 330 F.2d 11, 14, 49 CCH Labor Cases ¶ 31,561 (C.A. 7, 1964); *Hodgson v. Veterans Cleaning Service,* 482 F.2d 1362, 1369, 72 CCH Labor Cases ¶ 32,948 (C.A. 5, 1973). To permit an employer to thus reap the benefit of his own wrongdoing by accepting the return of back wages due under the Act would defeat the purposes of the Act, for it would reduce the incentives to reduce hours of work and spread employment, deprive employees of the intended extra compensation for overtime work, and subject complying employers to unfair competition in the marketplace.

111. Counsel for the parties shall promptly attempt to settle upon an appropriate judgment in accordance with these findings of fact and conclusions of law.

EXHIBIT A to follow.

EXHIBIT "A"

Employee: _Dale Bishop_

| Year & Quarter 1971 [1/] | Calculation [2a/] | [2b/] | [2c/] | Make-up Accrual in Quarter Plus Unpaid [2d] | Notations in Payroll Records — Make-up Accrual in Quar. [3a/] | Plus Unpaid [3b/] | Payments of Make-up Accruals — Date [4a/] | Amount [4b/] | Balance Unpaid After any Payment in Quarter Following Accrual [5/] | Comments [6/] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st | 540 hr × $6.00<br>$2813.00 + $345.00<br>$87.75 (B) | = $3240.00<br>= $3158.00<br>= $87.75<br>= $3070.25 | = $3240.00<br>= $3070.25<br>$169.75 | = $169.75 | $169.75 | $169.75 | | | $169.75 | |
| 2nd | 176.5 hr × $6.00<br>439 hr × $6.25<br>$3057.09 + $790.00<br>$107.09 (PS) | = $1059.00<br>= $2731.25<br>= $3790.25<br>= $3842.09<br>= $107.09<br>= $3740.00 | = $3790.25<br>= $3740.00<br>$50.25 | = $50.25<br>$50.25 | $50.25 | $50.25 | $220.00 | 7/1/71 | $220.00 | - 0 - |
| 3rd | 613 hr × $6.25<br>$3254.69 + $1005.00<br>$159.69 (PS) + $220.00 (B) | = $3831.25<br>= $4259.69<br>= $379.69<br>= $3880.00 | = $3831.25<br>= $3880.00<br>($48.75) | = ($48.75) | ($48.75) | | | | ($48.75) | |
| 4th | 367 hr × $6.25<br>209 hr × $6.50<br>$3127.08 + $503.00<br>$89.08 (PS) + $100.00 (Xmas) | = $2293.75<br>= $1358.50<br>$3652.25<br>$3630.08<br>$189.08<br>$3441.00 | = $3652.25<br>= $3441.00<br>$211.25 | = $3441.00<br>$211.25 | $211.25 | $211.25 | $162.50 | 1/10/72 | $162.50 | - 0 - |